**UNITED STATES of America**

**v.**

**Jose REYES, Francisco Medina and Thomas Rodriguez, Defendants.**

**No. S3 94 CR 872 (SAS).**

United States District Court,
S.D. New York.

May 21, 1996.

Bruce G. Ohr, Thomas A. Arena, Assistant United States Attorneys, United States Attorney's Office, Southern District of New York, New York City, for United States of America.

Diarmuid White, New York City, for Defendant Jose Reyes.

Lee Ginsberg, Freeman, Nooter & Ginsberg, New York City, for Defendant Thomas Rodriguez.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Defendant Jose Reyes ("Reyes") has moved for a dismissal of the indictment on the ground that the grand jury which returned it was not selected in accordance with the constitution and laws of the United States. Specifically, Reyes argues that the grand jury was selected in violation of the "impartial jury" component of the Sixth Amendment, the equal protection components of the Fifth and Fourteenth Amendments, and the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 *et seq.* ("Jury Act"). This claim is based on Reyes' contention that blacks and Hispanics are unconstitutionally underrepresented in the pool from which the grand jury was drawn. Defendant Thomas Rodriguez has joined in the motion.[1]

A hearing was held on April 24 and 26, 1996. At the close of the hearing, I denied the motion. This opinion sets forth the reasons for my decision.

### I. Selection of Jurors in This District

#### A. Construction of Master Jury Wheels

Lists of registered voters in eight New York counties are the sole source of potential jurors in the Southern District of New York. *See* Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York (hereinafter "Jury Plan"), Article III.A.[2] Potential jurors are chosen at random from the approximately 2.4 million registered voters. *Id.; see also* Transcript of Hearing held April 24, 1996 ("Tr.") at 7. According to the testimony of Robert Rogers, Jury Administrator, this number greatly exceeds the number of jurors needed by this district in a four-year period. Therefore, twenty percent of the registered voters from each county are selected by choosing every fifth voter beginning with a randomly selected starting number. Tr. at 7–8.

From these names, two master jury wheels are constructed: one for the Manhattan courthouse and one for the White Plains courthouse. For the master wheels, jurors from each county are drawn from that county's voter registration list in the same proportion to the total number of jurors drawn as that county's number of registered voters bears to the total number of registered voters for all eight counties.[3] Jury Plan, Art. III.A.1., III.B. The Manhattan master wheel (also called the Foley Square division) contains names drawn from the counties of New York, Bronx, Westchester, Putnam, and Rockland. The White Plains master wheel contains names from Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess counties. For the three overlapping counties (Westchester, Putnam and Rockland), the names are apportioned as follows: out of every ten names drawn from those counties, nine go to the Manhattan wheel and one goes to the White Plains wheel. Tr. at 11; *see also* Jury Plan, Art. IV.B.

According to the Jury Plan, the "master jury wheels shall be emptied and refilled by not later than September 1 following the date of each Presidential Election." *Id.* Thus the current master jury wheel was most recently rebuilt between November 1992 and September 1993. *See* Tr. at 29–30.

#### B. Construction of Qualified Jury Wheels

Once or twice a year, names are drawn randomly from the master jury wheels in an

---

1. *See* Letter of Lee Ginsberg, Attorney for Thomas Rodriguez, dated March 18, 1996.

2. The eight counties are New York, Bronx, Westchester, Putnam, Dutchess, Sullivan, Orange and Rockland. Jury Plan at 1. This Jury Plan became effective on December 15, 1988. *Id.* Art. XIII. Because the Jury Plan governs the selection of grand and petit jurors, and because grand and petit jurors are drawn from the same pool (*see* Jury Plan, Art. III.E.), the discussion in this Opinion will refer simply to "jurors" without distinguishing between grand and petit jurors.

3. For example, suppose that there are 700 registered voters in Orange County, and 200 registered voters in Dutchess County. Suppose further that the total number of registered voters in all eight counties is 2000. In choosing potential jurors, for every 100 names drawn total, 35 names will be drawn from the Orange County pool of registered voters, while 10 names will be drawn from the Dutchess County pool.

amount sufficient to meet the anticipated demand for jurors for the next six months. For the Foley Square division, approximately 25,000 to 27,000 names are drawn every six months. Tr. at 15, 17. These people are sent questionnaires for the purpose of determining their qualifications to sit as jurors. Jury Plan, Art. III.C. Potential jurors are instructed to complete the questionnaire and return it within ten days.[4] *Id.* Art. III.D. The names of persons who complete and return the questionnaire (and who are found to be qualified as jurors) constitute the qualified jury wheels. *Id.* Art. III.C. As with the master wheels, two separate qualified jury wheels are maintained: one for Foley Square and one for White Plains. When jurors are needed, names are drawn at random from these wheels. Summonses are sent to those whose names are drawn. *Id.* Art. IV.C.

## II. *Standard in the Second Circuit*

### A. *Equal Protection Claim*

█ This Circuit has adopted the Supreme Court's articulation of "the test for determining when a criminal defendant has shown that grand jury selection procedures violate the equal protection clause." *United States v. Biaggi,* 680 F.Supp. 641, 648 (S.D.N.Y. 1988) (citing *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977)), *aff'd in relevant part,* 909 F.2d 662 (2d Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991). Under that test, three elements are required to prove a prima facie case of discrimination in jury selection: (1) the group alleged to be discriminated against must be a recognizable, distinct class; (2) the degree of underrepresentation must be proved over a significant time period; and (3) the selection procedure

must be susceptible to abuse or racially non-neutral. *Castaneda,* 430 U.S. at 494, 97 S.Ct. at 1280. In upholding the *Biaggi* district court's dismissal of the Fifth Amendment claim, the circuit court reiterated the district court's statement that the defendant "made no claim that [b]lacks or Hispanics have been hindered in registering to vote. They have simply chosen not to register in the same proportion as [w]hites." *Biaggi,* 909 F.2d at 677. The court further noted that "[r]egistering to vote is a simple task of minimal inconvenience, viewed by many as an obligation of citizenship." *Id.* It is clear from *Biaggi* that in this circuit, a Fifth Amendment challenge to the composition of a jury pool, based on the equal protection component of that amendment's due process clause, will not stand absent evidence that an underrepresented group has been hindered in registering to vote.[5]

### B. *Sixth Amendment Claim*

#### 1. *Standard enunciated by Supreme Court and Biaggi*

█ The Supreme Court has interpreted the Sixth Amendment's guarantee of "a speedy and public trial, by an impartial jury" to entitle defendants in criminal cases to juries chosen from panels that represent a fair cross-section of the community. *Taylor v. Louisiana,* 419 U.S. 522, 526–29, 538, 95 S.Ct. 692, 695–97, 701, 42 L.Ed.2d 690 (1975). This requirement applies to grand jury panels as well. *See Castaneda,* 430 U.S. at 493–94, 97 S.Ct. at 1279–80 (claims of discrimination in the selection of grand jurors are governed by the same principles applicable to claims of equal protection violations in the selection of jury pools and venires). A de-

---

4. The questionnaire asks for information including the person's citizenship, age, county of residence for the past year, ability to understand English, race, and whether the person has been convicted of a felony. Supplemental Affirmation of Diarmuid White, Attorney for Jose Reyes, dated April 16, 1996, Ex. A. According to the Jury Plan, a person must have the following qualifications in order to serve as a juror: (1) age of eighteen years or older; (2) United States citizenship; (3) residence for at least a year within the judicial district; (4) ability to read, write and understand the English language sufficiently to fill out the questionnaire; (5) ability to speak

English; (6) absence of any mental or physical infirmity that would make a person incapable of rendering "satisfactory jury service"; and (7) absence of felony convictions or pending felony charges. Jury Plan, Art. VII (citing 28 U.S.C. § 1865(b)).

5. *See also Schanbarger v. Macy,* 77 F.3d 1424 (2d Cir.1996) (per curiam) (an equal protection challenge to composition of a jury pool is not viable absent evidence of hindrance in registering to vote).

fendant attempting to establish a prima facie violation of this requirement must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979); *see also United States v. Jackman*, 46 F.3d 1240, 1245–46 (2d Cir.1995) (citing *Duren*).

The third prong of this test is usually the most difficult to establish. In this circuit, that element may be satisfied by showing that substantial underrepresentation of distinctive groups occurred over a significant time period. *Biaggi*, 680 F.Supp. at 654. Discriminatory intent is not an element of a Sixth Amendment fair cross-section claim. *Jackman*, 46 F.3d at 1246; *Biaggi*, 909 F.2d at 677–78. Further, the "absolute numbers" approach is valid in this circuit: after determining a percentage disparity, the court evaluates the number of members of an underrepresented group that would have to be added to a 60-person venire in order for that venire to properly reflect the representation of that group in the community.[6] The court must determine whether these numbers are "so great as to amount to a violation of the fair cross-section requirement." *Biaggi*, 680 F.Supp. at 655.

### 2. Current status of Second Circuit law

The law of the Second Circuit on this issue is not as clear as it once was. Recently, in *Schanbarger v. Macy*, 77 F.3d 1424 (2d Cir.1996) (per curiam), the Second Circuit held that

> absent positive evidence that some groups have been hindered in attempting to register to vote, a jury venire drawn from voter registration lists violates neither the Sixth Amendment's fair cross-section requirement nor the Fifth Amendment's guarantee of Equal Protection.

77 F.3d at 1424. The court then cited two opinions from other circuits.

In the first case, *United States v. Ashley*, 54 F.3d 311 (7th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 232, 133 L.Ed.2d 161 (1995), the Seventh Circuit rejected a challenge to the composition of a jury pool on the ground that using lists of registered voters as the sole source of the pool resulted in an underrepresentation of blacks. The *Ashley* court found that the defendants had not established the third element (that the alleged disparity was the result of any systematic exclusion) and approved the use of "voter registration lists as the source of names for jury venires in this Circuit." *Ashley*, 54 F.3d at 314. In the other case cited in *Schanbarger*, the Fourth Circuit examined a multitude of cases and concluded that the authorities "categorically establish that there is no violation of the jury cross-section requirement when there is merely underrepresentation of a cognizable class by reason of failure to register, when that right is fully open." *United States v. Cecil*, 836 F.2d 1431, 1448 (4th Cir.), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 883 (1988). The court even stated that a conclusion that a substantial disparity would require supplementing the voter registration lists "flies in the face of all precedent and violates Congressional intent." *Id.* at 1451.[7]

The import of *Schanbarger* is unclear for several reasons. First, *Schanbarger* is a civil case. Reyes correctly points out that the circuit's statement is *dictum* because the Sixth Amendment does not apply to civil cases. *See Ricketts v. City of Hartford*, 74 F.3d 1397, 1407 (2d Cir.1996) ("Because Ricketts is a civil litigant, rather than a criminal defendant, he posits his claim of systematic exclusion of minority jurors as a violation of

---

6. The definition of "community" in this context is addressed in Part III.B.2.b., *infra*.

7. A recent Eighth Circuit opinion, not cited by the Second Circuit in *Schanbarger*, states that to succeed on a Sixth Amendment claim, "[i]n addition to a numerical disparity, a defendant must demonstrate that the voter-registration qualifications are suspect, or that the jury-selection procedure is administered in a discriminatory manner." *United States v. Ireland*, 62 F.3d 227, 231 (8th Cir.1995).

the Fifth Amendment's equal protection component. Indeed, the Sixth Amendment applies by its terms only to 'criminal prosecutions,' and does not govern civil trials."). Second, *Schanbarger* cites no Second Circuit cases other than *Biaggi*. This Court does not read *Biaggi* to preclude an inquiry into the degree of disparity between the representation of blacks and Hispanics in the community and in the jury pool. On the contrary, *Biaggi* suggests that if such disparities were substantial enough, they would constitute a violation of the Sixth Amendment. *See Biaggi*, 909 F.2d at 678. Finally, *Schanbarger* is a *per curiam* opinion. If, by citing the opinions of other circuits (*Ashley* and *Cecil*), the Second Circuit intends to adopt those holdings, it should explicitly say so. This is especially true where, as here, the holdings of the cases cited differ markedly from the law as it stands in this circuit. Given the foregoing, this Court views *Biaggi* as the law of this circuit on this issue. (In fact, the Government conceded as much at oral argument. *See* Transcript of Argument held April 26, 1996 ("Arg.Tr.") at 40.) Accordingly, I must evaluate the statistical evidence presented to the Court. I do so in Part III.B., *infra*.[8]

### C. *Statutory Claim*

The Jury Selection and Service Act of 1968 mandates the use of voter registration lists (or lists of actual voters) as the basic source of potential jurors. 28 U.S.C. § 1863(b)(2) (1994). The Jury Act prohibits the exclusion of jurors on account of race or national origin (among other characteristics). *Id.* § 1862. The stated policy behind the Act is

> that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States.

28 U.S.C. § 1861. In addition to directing the use of voter registration lists, the Act requires the use of additional sources if necessary to foster the policy behind the Act. *Id.* § 1863(b)(2).

■ In this circuit, courts faced with claims under the Jury Act must decide "whether the disparity in the present case [is] sufficient to mandate resort to a supplemental source." *United States v. Jenkins*, 496 F.2d 57, 64–65 (2d Cir.1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975), *quoted in Biaggi*, 680 F.Supp. at 657. Where the substantiality of any underrepresentation is insufficient to sustain a Sixth Amendment challenge, neither is it great enough to sustain a Jury Act claim. *Biaggi*, 680 F.Supp. at 657; 909 F.2d at 678.

### III. *Application of Standard*

### A. *Equal Protection Claim*

■ Proof of discriminatory intent is necessary for an equal protection claim to succeed. *Biaggi*, 680 F.Supp. at 651–52. Reyes attempts to prove discriminatory intent by offering the testimony of the Jury Administrator regarding the failure to send questionnaires back to potential jurors who have not answered all of the questions. Arg. Tr. at 10–12. Rogers testified that if a potential juror has left blank one or both of the questions on race and ethnicity, but has answered the questions relevant to juror qualifications, then he does not send the questionnaire back. Tr. at 25–26. As Reyes points out, this procedure violates the Jury Plan: "[i]n any case in which it appears that there is an omission, ambiguity, or error in a returned jury qualification form, the Clerk shall send it back with instructions to make such additions or corrections as may be nec-

---

**8.** One could read *Schanbarger* to hold that no matter how great a disparity exists, using voter registration lists as the sole source of potential jurors never violates the Sixth Amendment (assuming that underrepresented groups are not hindered in registering to vote). To the extent that this is the holding of *Schanbarger*, and to the extent that *Schanbarger* binds this Court in a criminal case, there is no need for me to reach the statistical evidence presented to the Court. Because defendant has offered no evidence that blacks or Hispanics in this district are in any way hindered in registering to vote, under the above-described reading of *Schanbarger*, I would deny the motion.

essary...." Jury Plan, Art. III.D. However-er, I credit the testimony of the Jury Admin-istrator in providing an explanation for the practice: he does not re-mail those question-naires because the missing information on race or ethnicity does not affect qualification for jury service. *See* Tr. at 26. There is no suggestion that the Administrator's action demonstrates a discriminatory intent. Nor does the failure to collect all race and ethnici-ty information prove that the method of jury selection is "susceptible to abuse or racially non-neutral," as required by *Castaneda*.

## B. *Sixth Amendment Claim*

Because courts have held that blacks and Hispanics are "distinctive" groups in the community, Reyes easily meets the first of the three *Duren* factors required to establish a prima facie violation of the Sixth Amend-ment. *Jackman*, 46 F.3d at 1246. In consid-ering the second *Duren* element, the Court must determine "whether either or both of these two 'distinctive' groups are 'signifi-cant[ly] underrepresent[ed]' in the jury selec-tion process." *Id.* (citing *Biaggi*, 909 F.2d at 677) (alteration in original). Evaluating the degree of underrepresentation of blacks and Hispanics in the jury pool first requires an understanding and assessment of the meth-odology used by the defense and Government experts.

### 1. *Samples evaluated by experts*

The experts studied the race and ethnicity of two samples of the jury pool in this dis-trict. The JS–12 study is based on a report of the race and ethnicity of a 1,000–person sample, while the Jury Wheel study is based on the returns from the approximately 27,000

9. At that time, the Foley Square division master jury wheel contained 397,015 names. Tr. at 47.

10. While the JS–12 form directs Rogers to send questionnaires to at least 300 people, he and his staff decided to send 1,000 questionnaires be-cause they knew that not every addressee would complete and return the questionnaire. Tr. at 32–33.

11. The more recent version of the questionnaire (revised April 1994) separates race and ethnicity into two questions. *See* Letter of Robert Rogers dated April 25, 1996 (attaching new version).

people who are sent questionnaires twice a year. *See* Part I.B., *supra*.

### a. *JS–12 study*

The JS–12 is a form created by the Judi-cial Conference of the United States, and is entitled "Report on Operation of the Jury Selection Plan." Tr. at 33; Defendant's Ex-hibit ("Def.Ex.") B. District courts must complete the report and submit it to the Administrative Office of the United States Courts. *See* 28 U.S.C. § 1863(a). The pur-pose of the report is to describe the racial, gender and ethnic composition of jury lists. Tr. at 29. A report is made once every four years, at the beginning of a new jury wheel. *Id.* The Jury Administrator last completed a JS–12 report on September 29, 1994. Def. Ex.B.

In order to complete the report, a sample of 1,000 names from the Foley Square divi-sion master jury wheel was randomly drawn on January 25, 1994.[9] Within the two weeks following the drawing, questionnaires were printed and mailed to the 1,000 addressees.[10] Tr. at 30, 32–33. These questionnaires are identical to the questionnaires sent out to persons in order to construct the qualified jury wheel. Moreover, the addressees in the JS–12 study did not know whether they were being questioned as part of a study or for the purpose of determining their qualifications to sit as jurors. Tr. at 35.

On the version of the questionnaire used in the JS–12 study, one question (# 10) covered both race and ethnicity.[11] The question is entitled "RACE" and states: "To assist in ensuring that all people are represented on juries, please indicate which of the following applies to you. Nothing disclosed will affect your selection for jury duty (see Note 10 on reverse)." [12] Def.Ex.A. Five boxes follow,

This more recent version of the questionnaire was used for the Jury Wheel study, discussed in Part III.B.1.b., *infra*.

12. The note accompanying the race question states that

Federal law requires you as a prospective juror to indicate your race. This answer is required solely to avoid discrimination in juror selection and has absolutely no bearing on qualifications for jury service. By answering this question you help the federal court check and observe the juror selection process so that discrimina-

marked Black, American Indian, White, Asian, and Other. Underneath the box for "other" lies another question, in print smaller than that of the above-quoted statements. That question asks "Are you Hispanic?" and is followed by two boxes labeled yes and no. *Id.; see also* Tr. at 25.

The rate of response to the JS–12 study was 55.5%: 555 out of 1,000 questionnaires were completed and returned. Tr. at 33; Def.Ex.B. The number of questionnaires returned by the Postal Service as undeliverable was 109,[13] and the number of unreturned questionnaires was 336. Out of the 555 completed and returned questionnaires, 474 addressees answered the race question, and 81 of those 474 identified themselves as black. Of the 168 addressees who answered the ethnicity question, 59 identified themselves as Hispanic. Def.Ex.B.

### b. *Jury Wheel study*

The second sample studied by the experts is called the Jury Wheel study. It consists of 27,539 addressees to whom questionnaires were mailed in November 1995 for the purpose of determining the addressees' qualifications to serve as jurors. *See* Defendant's Supplemental Memorandum in Support of Motion to Dismiss the Indictment Due to Discrimination in the Selection of the Grand Jury ("Def.Sup.Mem.") at 2–3; Declaration of Bernard R. Siskin, Government Expert ("Siskin Decl."), ¶ 4. Out of those 27,539 questionnaires, 12,887 were completed and returned. Table appended to Siskin Decl. ("Gov't Table") 2B. This is a return rate of 46.8%. No data are available regarding which of the remaining questionnaires were

undeliverable and which were deliverable but unreturned. Def.Sup.Mem. at 4 n. 3.

The defense expert, Andrew Beveridge, did not rely on any self-reported data on race and ethnicity from the Jury Wheel questionnaires because "the questionnaires themselves provide an inadequate basis for determining the race or Hispanic status of names in the master wheel—both because of the high rate of unreturned or undeliverable questionnaires and because of the low rate of response to the race/Hispanic status questions on the returned questionnaires." *See* Def.Sup.Mem. at 5–6; Siskin Decl. ¶ 5. Instead, Beveridge imputed race and Hispanic status to everyone who returned questionnaires (in both samples) using a statistical method called geocoding (also known as address matching). This method "consists of assigning each individual address on mailed questionnaires to a specific longitude and latitude on the map." Def.Sup.Mem. at 5–6. Data supplied by the Census Bureau (based on the 1990 Census) are then used to create a street map of the United States and estimate the racial and ethnic composition of each block. Tr. at 59. Finally, Beveridge estimated the racial and ethnic composition of the samples based upon the ethnic and racial composition of a geographic block or a group of blocks. Tr. at 61–62.[14]

While acknowledging that geocoding is "commonly used," Siskin criticizes Beveridge's use of the methodology on the "subpopulations of those who did and did not return the jury questionnaires and for the subset of undeliverable questionnaires." Siskin Decl. ¶¶ 5, 7. Siskin considers those who returned

---

tion cannot occur. In this way the federal court can fulfill the policy of the United States which is to provide jurors who are randomly selected from a fair cross section of the community. Def.Ex.A.

**13.** The parties stipulated that the Jury Administrator mails all jury questionnaires via first-class mail, and that the United States Postal Service "returns to the sender all First–Class Mail that either cannot be delivered as addressed or cannot be forwarded." The parties also agreed that if "an addressee has filed a change-of-address form," the Postal Service forwards first-class mail for twelve months. From twelve to eighteen months, first-class mail is "returned to the sender accompanied by the addressee's new ad-

dress." After that, the Postal Service "returns all mail to the sender with the notation 'Forwarding Order Expired.'" *See* Arg.Tr. at 2–3.

**14.** As an example, consider the following: "[I]f 25 voting age residents were in a block, and five of them were black and 20 of them were white, then a factor of .2 black and .8 white would be used to impute the race of the addressee." Def. Sup.Mem. at 6. Or, as Siskin put it, "if ten prospective jurors reside in a census block which is 30% African American and 20% Hispanic among those of voting age, then three of the ten jurors are estimated to be African Americans and two of the ten are estimated to be of Hispanic origin." Siskin Decl. ¶ 5.

questionnaires (as opposed to the whole group who were sent questionnaires) to be a self-selected subset.[15] *See* Tr. at 151–53. In Siskin's opinion, the geocoding methodology is invalid when applied to self-selected subsets.[16] *Id.* ¶ 7; Tr. at 172. Beveridge agrees that geocoding may be invalid when used for self-selected subsets.[17] Tr. at 90–91. However, Beveridge disagrees with Siskin's assertion that the subset of people who returned questionnaires, in both samples, is self-selected. Tr. at 66–67.

### 2. *Resolving disagreements between the experts*

In addition to disagreeing over the use of geocoding (and which subsets are self-selected), the experts disagree over at least two other issues. They differ over how to treat the undeliverable and unreturned questionnaires when analyzing the data, and they disagree over the relevant population for the purpose of comparison.

#### a. *Whether to include unreturned questionnaires in calculations*

Beveridge excluded unreturned and undeliverable questionnaires from his analysis. He determined that the addressees of those questionnaires are effectively unavailable for summoning as jurors and thus cannot be considered part of the potential jury pool. Def.Sup.Mem. at 8; Tr. at 78–79. Therefore, he did not include them in his calculations of the composition of the jury pool. By contrast, Siskin focused on the total samples

drawn.[18] Siskin Decl. ¶ 10. As the Government suggested in its closing argument, it believes that the unreturned questionnaires were more likely the result of people choosing to ignore the form than the result of people having moved or died. Arg.Tr. at 50. Siskin himself said that he assumed that most people who received the questionnaire simply did not send it back. Tr. at 152. For this reason, he chose to include the unreturned questionnaires in his calculations.

Whether the unreturned questionnaires are included or excluded affects the degree of disparity that the defendant can demonstrate. In *Biaggi*, the district court determined that the unreturned questionnaires should not be included in the analysis.[19] *Biaggi*, 680 F.Supp. at 647. However, in *Biaggi*, the defendant's expert's calculations of the racial and ethnic composition of the jury pool were based on self-reporting, rather than on geocoding. *Id.* at 644–45. The district court concluded that geocoding would have been the "ideal treatment of the incomplete and lost questionnaires," but time constraints did not allow for the application of that methodology. *Id.* at 647. Further, the court noted that "it is preferable to avoid combining statistical methodologies." *Id.* Therefore the court concluded that the incomplete and lost questionnaires had to be excluded from the analysis. *Id.*

■ The *Biaggi* problem—that is, the specter of combining different statistical

---

**15.** Where a set of people is randomly chosen, and where the number of people in that set is reduced in a way that destroys the random nature of the group, the subset is self-selected.

**16.** For example, Siskin says it is clear that geocoding does not provide a reliable estimate for the number of Hispanics in the JS–12 sample. Tr. at 157, 162. According to Siskin, the percentage estimated through geocoding is much lower than the number obtained by the actual reporting of Hispanic status. Siskin Decl. ¶ 8. While 59 out of the 168 people who reported their Hispanic status indicated that they are Hispanic (*see* Def.Ex.B), Siskin stated that geocoding would predict that 28 out of those 168 would be Hispanic. Tr. at 165.

**17.** Because Beveridge considers the 168 people who answered the ethnicity question in the JS–12 sample a self-selected subset (*see* notes 15–16,

*supra* ), he did not (and would not) apply geocoding to that group. Tr. at 89–90.

**18.** Siskin included the undeliverable questionnaires in his analysis of the JS–12 data. However, he stated that excluding those questionnaires would not change the outcome of his analysis. Tr. at 151, 156. Siskin similarly included undeliverable questionnaires in analyzing the total Jury Wheel sample. Tr. at 156. In that study, no distinction was made between unreturned and undeliverable questionnaires.

**19.** The defense expert in *Biaggi* analyzed four different samples. Three samples were taken from the reels of the 1984 Master Jury Wheel; the sizes of those samples were 447, 1,079, and 5,784. The fourth sample was taken from the 1980 Master Jury Wheel and included 4,519 prospective jurors.

methodologies—does not exist here. In this case, geocoded data are available for the entire data in both the JS–12 and the Jury Wheel studies. *See* Def.Ex.E, F; Gov't Tables 2A, 2B, 3A, 3B; Chart dated May 15, 1996.[20] Although both experts have examined the self-reporting of race and ethnicity in the JS–12 study, both experts acknowledged that the 1,000 names in the JS–12 study constitute a small sample. *See* Tr. at 68, 116, 169. Further, the Government expert stated that when geocoding is used for an entire sample, the larger sample is better. *See* Tr. at 169. This expert testimony suggests that the larger sample better represents the actual composition of the population being studied. Consequently, the Court will not rely on the JS–12 study in deciding this motion. Only the geocoded data from the Jury Wheel study will be considered.

At first blush, the argument of the defense expert makes intuitive sense. If a person's questionnaire is not returned or is undeliverable, there is no way that person can be summoned to serve on a jury. As the defense points out, that person is effectively unavailable for jury service. However, there are several reasons that a person might not return a questionnaire: (1) the person does not want to serve on a jury (and thus ignores the questionnaire); (2) the person knows or believes that he or she is unqualified to serve on a jury (and ignores the questionnaire); (3) the person has died (and the recipient of the questionnaire throws it out rather than returning it); or (4) the person has moved (and again the recipient throws the questionnaire out rather than returning it or forwarding it). In excluding all unreturned questionnaires from his analysis, Beveridge is implicitly assuming that every unreturned questionnaire was sent to someone who has died or moved out of the district.[21] However, people who *choose* not to serve—whether because they simply do not want to serve or because they think they are unqualified—are still part of the potential jury pool. They *could* be considered for service if they returned the questionnaire. Thus Beveridge is overstating the problem of addressees who have moved or died.

On the other hand, the Government understates the problem. Siskin's inclusion of all unreturned questionnaires in his analysis implicitly assumes that everyone who did not return a questionnaire has done so by choice.[22] Such a scenario is highly unlikely, especially in New York and Bronx counties, where a non-purging order prevented any updating of the voter registration lists from 1988 until late 1995. *See* note 19, *supra.*

I agree with Siskin that people who choose not to return a questionnaire should be considered part of the jury pool, and I agree with Beveridge that people who have died or moved out of the district are effectively unavailable as jurors. The problem, of course, is that there is no way of knowing how many unreturned questionnaires are the result of people opting out of jury service and how many are the result of people having moved or died. But because blacks and Hispanics constitute a substantially higher percentage of the group of people who did not return questionnaires than of the group of people who did (*see* Def.Ex.F), the defendant's estimates of the black and Hispanic composition of the jury pool are probably too low, and the Government's estimates are probably too

---

**20.** In preparing this opinion after the close of the hearing, I determined that certain additional statistical data would provide a more complete record. At a telephone conference on May 3, 1996, attorneys for both the Government and the defense agreed to allow their experts to supplement the record by providing a breakdown of the Jury Wheel study results by county. The Chart dated May 15, 1996 contains these additional data.

**21.** Beveridge believes that a high percentage of the questionnaires unreturned from New York and Bronx counties is due to a failure to purge the voter registration lists of those counties. Whether the percentage is high or not, to some extent Beveridge is correct. From 1988 until

late 1995, a court order prevented the New York City Board of Elections from purging the voter registration list of people who had moved or died. *See Ashe v. Board of Elections in the City of New York,* No. 88–1566, 1988 WL 68721 (E.D.N.Y. June 8, 1988); *Ashe v. Board of Elections in the City of New York,* No. 88–1566, 1988 WL 68719 (E.D.N.Y. May 23, 1988).

**22.** Siskin himself undercut this assumption when he stated that the proper group to study is "everybody on the wheel less the people [who] aren't real, whose addresses really don't exist." Tr. at 153.

high.[23] However, I have no way of making an informed decision as to which estimates are closer to the truth. Therefore I will estimate the jury pool composition in the following way.

The rate of unreturned questionnaires sent to Putnam County is 32%, the lowest rate of non-returns for the five counties that comprise the Foley Square division. Tr. at 75.[24] As the Government suggested at oral argument, because Putnam County consists largely of single-family homes, it is unlikely that very many of Putnam County's unreturned questionnaires were undeliverable. The Government's theory is that Putnam County residents move infrequently and leave forwarding addresses when they do move. *See* Arg. Tr. at 54. Further, there is no evidence that voter registration lists from Putnam County were not regularly purged or updated. The Government thus suggested that the Court assume that all of the unreturned Putnam County questionnaires reached the intended recipients but were ignored by those recipients. The Government further suggested that Putnam County's presumed throw-away rate (meaning the percentage of people who received questionnaires but ignored them) could serve as a proxy for the (unknown) throw-away rate of each of the five counties.

*Id.* I agree. However, I will adjust the Putnam County rate downward slightly, from 32% to 30%, because even in Putnam County it is virtually impossible that *all* of the unreturned questionnaires reached the intended recipient but were ignored. Certainly some people moved or died.

▌ Therefore, I will assume that thirty percent of questionnaires sent to each county reached the intended recipient but were ignored. Consequently, in estimating the racial composition of the jury pool (based on the Jury Wheel study), I will include in my analysis all of the returned questionnaires as well as a portion of the unreturned questionnaires equal to thirty percent of the total number sent to each county.[25] My summary of the disparities (set forth in Part III.B.3., *infra*) and the attached Schedules reflect this assumption. In order to estimate the composition of the Jury Wheel study as precisely as possible, I have compared the number of blacks and Hispanics who returned questionnaires or ignored them to the total number of people who returned questionnaires or ignored them.[26]

### b. *Relevant comparisons*

The Government expert has drawn three comparisons in order to assess the degree

23. Applying Beveridge's method, the defendant argues that the black and Hispanic populations of the Jury Wheel study are 16.14% and 15.92%, respectively. Reyes compares these numbers to the voting-age population of blacks and Hispanics (22.22% and 23.50%) to show disparities of 6.08% for blacks and 7.58% for Hispanics. *See* Def.Ex.E (as amended); Def.Sup.Mem. at 9.

The Government, in applying Siskin's method, argues that the black and Hispanic populations of the Jury Wheel study are 21.58% and 17.44%, respectively. The Government compares these numbers to the voting-age citizen population of blacks and Hispanics (21.82% and 18.99%) to show disparities of .24% for blacks and 1.55% for Hispanics. *See* Gov't Table 4B (as amended); Gov't Mem. at 12–13.

24. The unreturned rate for Rockland county is 35%; for Westchester, 36%; for Bronx, 59%; and for New York, 62%. Tr. at 75.

25. In order to show that defendants would not succeed even if the thirty percent rate is too high, I have performed the same calculations assuming throw-away rates of twenty percent and ten percent. *See* Part III.B.3., *infra;* note 35, *infra;* attached Schedules 2 and 3.

26. The computation was performed as follows (results shown in attached Schedule 1).

The denominator is mathematically represented as:

**total number of people who returned questionnaires**

+

**total number of people who ignored questionnaires** [which I estimate to be thirty percent of the total number of questionnaires sent to each county]

The numerator (for blacks) is mathematically represented as:

**number of blacks who returned questionnaires** [computed by multiplying number of questionnaires returned from each county by percentage of that county's returned questionnaires made up of blacks]

+

**number of blacks who ignored questionnaires** [computed by multiplying number of questionnaires ignored in each county [estimated as thirty percent of the total questionnaires sent to each county] by percentage of that county's unreturned questionnaires made up of blacks]

The calculation is performed the same way for Hispanics.

of underrepresentation (if any) of blacks and Hispanics in the jury venire. First, he compared the percentage of blacks and Hispanics in the two samples with the percentage of those groups in the voting-age population. Siskin views this as "the most reliable comparison possible given the available statistical data." Memorandum in Opposition to Motion to Dismiss the Indictment Due to Discrimination in the Selection of the Grand Jury ("Gov't Mem.") at 9. Second, Siskin compared the percentage of blacks and Hispanics in the two samples with the percentage of those groups in the voting-age citizen population. *Id.; see also* Tr. at 155–56. Finally, Siskin attempted a comparison between the percentage of blacks and Hispanics in the qualified jury venire and the percentage of those groups in the qualified general population. However, Siskin was "reluctant" to make this third comparison, because he believes that Beveridge's method of computing the composition of this subset of the samples is suspect.[27] Gov't Mem. at 9–10. Reyes points out that he is not challenging the composition of the *qualified* jury pool, but of the master jury wheel, conceding that "underrepresentation in the qualified pool may be for diverse reasons that are not 'systematic.'" Def. Reply Mem. at 11. Consequently, the Court will disregard the third category of comparisons drawn by Siskin. Further, as discussed above, the numbers provided by both experts will be adjusted to incorporate a portion of the unreturned questionnaires.

▆ The next question is whether to compare the sample group to the voting-age population or the voting-age citizen population. Defendant argues that the appropriate comparison is to the voting-age population. Def. Reply Mem. at 11. The Government argues that the voting-age citizen population is a more relevant measure. Arg.Tr. at 41. In fact, the Government goes even farther, suggesting that the Court should compare the percentage of blacks and Hispanics in the samples with the percentage of blacks and Hispanics in the "minimally qualified" population. Tr. at 154–55. The Government defines this term as the population of voting-age citizens who can speak English and who can leave their homes. Tr. at 111, 155.

Defendant cites several cases in support of his position, although none states the proposition he urges. In *Duren*, the Supreme Court stated that "the fair-cross-section requirement involves a comparison of the makeup of jury venires or other sources from which jurors are drawn with the makeup of the community, not of voter registration lists." 439 U.S. at 365 n. 23, 99 S.Ct. at 669 n. 23. However, the Court was not confronted with the question of whether the "community" constitutes all voting-age persons or only voting-age citizens. In *United States v. LaChance*, 788 F.2d 856 (2d Cir.1986), the court addressed the question of whether to compare the jury pool composition to the percentages of blacks and women in the voting-age population of the whole state or of one county. *See* 788 F.2d at 867–68. Finally, the issue was not directly raised in *Jackman*. The court merely stated in passing that the "relevant comparison, for purposes of assessing the representativeness of the system, would normally be between the number of minority persons in the population and the number of persons belonging to the class found in the jury pool." 46 F.3d at 1246.

Reyes also cites *Biaggi* in support of the proposition that the proper comparison is to the voting-age population. In *Biaggi*, the district court criticized several aspects of the statistical method used by the defense expert. The court's criticisms led it to modify the findings of the expert in ways that diminished the disparities alleged by the defendant. 680 F.Supp. at 646–47. However, after doing so, the court addressed (and disallowed) additional attacks by the Government that would have further reduced the disparities in *Biaggi*. Specifically, the court rejected the Government's attempt to elimi-

---

27. Siskin confirmed at the hearing that this third comparison is difficult to make. Tr. at 154–55. Strangely, though, Siskin states in his Declaration that the third comparison is "the only comparison which makes any sense." Siskin Decl.

¶ 10. Given that the Declaration conflicts with both the Government's Memorandum and with Siskin's testimony, the Court accepts the hearing testimony as the most current statement of Siskin's opinion.

nate non-English speakers from the comparison pool:

> The Government has confused the concepts of "eligibility" and "qualification" in arguing that persons who do not speak English should be excluded from the analysis. The focus here is on eligible jurors whose names are taken from voter registration lists; one need not speak English to register to vote.

*Biaggi,* 680 F.Supp. at 647–48.

Contrary to what Reyes intended by citing this section of *Biaggi,* the decision in fact supports the argument that the population of voting-age citizens should form the basis of comparison.[28] If the focus is on eligibility to register to vote, as *Biaggi* suggests, then citizenship is an acceptable requirement because non-citizens cannot vote.[29] Even a consideration of juror qualifications, rather than eligibility to vote, would support the use of the voting-age citizen population as a basis of comparison. While some juror qualifications are embodied in bright-line rules (such as citizenship—*see* 28 U.S.C. § 1865(b)(1)), others require the exercise of judgment. For example, determinations regarding the ability to speak English and the ability to leave one's home are to some extent discretionary. One person with a certain level of facility in English may label herself fluent, while another with the same ability may consider himself unable to speak English be-

cause his grammar is less than perfect. The definition of "homebound" can similarly vary with the person using the term.[30] By contrast, no degree of judgment is involved in determining whether someone is at least eighteen years old and whether he is a United States citizen. (Determining whether someone has been convicted of a felony is similarly free of judgment, but is virtually impossible to track, unlike citizenship and age.) Therefore, I conclude that the relevant population with which to compare the percentages of blacks and Hispanics in the jury pool is the population of voting-age citizens.

*3. Assessment of disparities*

▮ Based on the foregoing decisions regarding the statistical methodology employed by the experts, the relevant data are as follows. Voting-age black citizens constitute 21.82% of the voting-age citizen population in the Southern District of New York. Def. Ex.F (as amended); Gov't Table 4B (as amended).[31] Voting-age Hispanic citizens constitute 19.00% of the voting-age citizen population in the Southern District of New York.[32] *Id.* Blacks account for 19.65% of the Jury Wheel study, while Hispanics account for 17.07% of that study. *See* Chart dated May 15, 1996; attached Schedule 1. These numbers reveal a 2.17% absolute disparity for blacks and a 1.93% absolute disparity for Hispanics.[33] These disparities are

---

28. In *Biaggi,* the defense expert used the population of voting-age citizens as the basis of comparison. However, the court did not address this issue; presumably the defense expert simply assumed that that was the relevant population. *See* 680 F.Supp. at 644.

29. Indeed, the very terminology employed suggests that eligibility to register to vote is the proper inquiry. The relevant population for comparison is the population of voting age and voting nationality—that is, voting-age citizens.

30. In statutory language, a person is not qualified to serve as a juror if the person "is incapable, by reason of mental or physical infirmity, to render satisfactory jury service." 28 U.S.C. § 1865(b)(4).

31. The Government expert made a typographical error on Tables 4B and 5B. He revised these tables to correct the error on May 14, 1996. The defense expert made a mathematical error in Defendant's Exhibit F; he corrected the error on

May 13, 1996. Both parties submitted amended versions of the exhibits.

32. The foregoing percentages (21.82% and 19.00%) refer to the percentage of blacks and Hispanics respectively in the voting-age citizen population of the Foley Square division of the Southern District of New York. The voting-age citizen population of the Foley Square division is computed by adding the entire voting-age citizen populations of New York and Bronx counties to ninety percent of the voting-age citizen populations of Westchester, Putnam and Rockland counties. *See* Def.Ex.F (as amended), and discussion in Part I.A., *supra.*

33. Under the "absolute numbers" approach, 1.3 blacks would have to be added to a 60–person venire in order for that venire to reflect the representation of blacks in the voting-age citizen population. Similarly, 1.2 Hispanics would have to be added to a 60–person venire in order to achieve perfect parity. These numbers are calcu-

less than the discrepancies found (and accepted) by the Second Circuit in *Biaggi. See* 909 F.2d at 677–78 (disparity for blacks was 3.6%; disparity for Hispanics was 4.7%). Accordingly, I find that the degree of underrepresentation is not so great as to constitute a violation of the Sixth Amendment.[34]

Even if the Court's choice of thirty percent as the portion of questionnaires that were ignored is high, defendant would still be unable to show that the disparities are so great as to constitute a violation of the Sixth Amendment's fair cross-section requirement. For example, if the Court assumes that only twenty percent of the questionnaires were ignored, then the percentage of blacks and Hispanics in the Jury Wheel study would be 18.86% and 16.44%, respectively. *See* attached Schedule 2. The associated disparities are 2.96% and 2.56%, still within the range accepted in *Biaggi.* The same can be said if the Court assumes a throw-away rate as low as ten percent. *See* attached Schedule 3 (percentage of blacks and Hispanics in the Jury Wheel study would be 17.79% and 15.58%; disparities are 4.03% and 3.42%).[35]

 Of course, a finding that the above disparities are not unconstitutional is not the same as an endorsement of such discrepancies. To be sure, defendants in criminal cases are entitled to a jury pool composed of a fair cross-section of the community, not to one that perfectly reflects the community. The "Sixth Amendment guarantees the opportunity for a representative jury venire, not a representative venire itself." *United States v. Jackman,* 46 F.3d 1240, 1244 (2d Cir.1995) (citing *Roman v. Abrams,* 822 F.2d 214, 229 (2d Cir.1987), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989)). Under that standard, the representation of blacks and Hispanics in jury venires in this district is sufficient. But this Court believes that serious consideration should be given to amending the jury selection procedures in the Southern District of New York. Every other district in this Circuit but one [36] now draws potential jurors

---

lated by multiplying the disparity by 60. *See* Gov't Table 5B (as amended), n. 2. The corresponding figures in *Biaggi* were two blacks and two to three Hispanics. 909 F.2d at 678.

**34.** Reyes has not met the second *Duren* requirement: he has not shown that "the representation of [blacks and Hispanics] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community." *Duren,* 439 U.S. at 364, 99 S.Ct. at 668. Therefore, I need not reach the third *Duren* element, which requires a showing that the "underrepresentation is due to systematic exclusion of th[ese] group[s] in the jury-selection process." *Id.*

However, in the event that a reviewing court determines that Reyes has met all of the *Duren* factors, then defendant's Sixth Amendment claim would still fail if the law of this Circuit is, as *Schanbarger* suggests, that no Sixth Amendment fair cross-section claim is viable absent evidence that blacks and/or Hispanics have been hindered in registering to vote. Alternatively, defendant's claim would fail if the Government could "demonstrat[e] a significant interest in the procedure used." *Jackman,* 46 F.3d at 1248 (citing *Duren* ).

Further, I note that at least "four circuits have expressly indicated that an absolute disparity of less than ten percent does not constitute substantial underrepresentation." *Jackman,* 46 F.3d at 1252 (Walker, J., dissenting) (collecting cases). Under that standard, should the Second Circuit

---

adopt it, Reyes' Sixth Amendment claim clearly fails.

**35.** I am aware that the selection of thirty percent as the portion of questionnaires ignored may be viewed as arbitrary, and that the court's adjustment of the expert data may be viewed as tinkering. The only pure way to evaluate the data is to choose all or nothing: either define "jury pool" as the group of people who returned questionnaires (as defendant advocates) or define the term to include everyone who was sent a questionnaire (as the Government proposes). If pressed, I would choose the Government's approach. However, even if "jury pool" is defined only as the group who returned questionnaires, as urged by Reyes, the disparities barely exceed those found in *Biaggi.* (Note that I am still using the citizenship-adjusted numbers because the proper comparison is to voting-age citizens. *See* Part III.B.2.b., *supra.*) The black population in the Jury Wheel study (returned questionnaires only) is 16.26%, while the Hispanic population is 14.36%. *See* Def.Ex.F (as amended); attached Schedule 4. The disparities are therefore 5.56% for blacks and 4.64% for Hispanics. For Hispanics, the discrepancy is less than the greater of the *Biaggi* disparities (which was 4.7%), while for blacks, the discrepancy just exceeds the greater *Biaggi* disparity.

**36.** The one district in this Circuit (besides the Southern District of New York) that does not supplement voter registration lists is the District of Vermont. According to the 1990 Census, Ver-

from motor vehicle records in addition to voter registration lists. Defendant's Memorandum in Support of Motion to Dismiss the Indictment Due to Discrimination in the Selection of the Grand Jury ("Def.Mem.") at 5. The Jury Administrator believes that the Eastern District of New York uses tax records as well. Tr. at 4–5. New York State similarly supplements the list of registered voters with records from the Department of Motor Vehicles, tax records, and welfare records. Tr. at 5. The Southern District could do more to expand the pool of potential jurors.

### C. *Statutory Claim*

In order to decide whether the jury selection system in this district violates the Jury Selection and Service Act, courts in this cir-

mont's population contains the highest percentage of whites (98.3%) of any state in the nation.

cuit must decide whether a disparity is "sufficient to mandate resort to a supplemental source." *United States v. Jenkins,* 496 F.2d 57, 64–65 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975). I have already determined that the underrepresentation in this case is insufficient to sustain Reyes' Sixth Amendment claim. Therefore, the disparity is similarly insufficient to support the Jury Act claim, and that claim must fail. *See Biaggi,* 909 F.2d at 678.

### IV. *Conclusion*

For the foregoing reasons, defendant's motion to dismiss the indictment due to discrimination in the selection of the grand jury is denied.

SO ORDERED.

Def.Mem. at 5.

## SCHEDULE 1

### PERCENTAGE OF BLACKS AND HISPANICS IN JURY WHEEL STUDY BASED ON RETURNED QUESTIONNAIRES PLUS ESTIMATED NUMBER OF QUESTIONNAIRES IGNORED BY RECIPIENT

THROW–AWAY RATE USED: 30%

| County | Total QNs Sent to County [1] | # of QNs Returned from County | # of QNs Thrown Away in County [3] | % Ret. QNs Made up of Blacks | % Unret. QNs Made up of Blacks |
|---|---|---|---|---|---|
| New York | 11,872 | 4,482 | 3,562 | 16.62% | 25.10% |
| Bronx | 7,166 | 2,876 | 2,150 | 33.55% | 38.77% |
| Westchester | 5,701 | 3,564 | 1,710 | 7.59% | 14.81% |
| Rockland | 1,757 | 1,142 | 527 | 4.27% | 7.98% |
| Putnam | 672 | 452 | 202 | 1.24% | 1.58% |
| | 27,168 [2] | 12,516 | 8,150 | | |

Percentage of Blacks in Jury Wheel Study 19.65%

| County | Total QNs Sent to County [1] | # of QNs Returned from County | # of QNs Thrown Away in County [3] | % Ret. QNs Made up of Hispanics | % Unret. QNs Made up of Hispanics |
|---|---|---|---|---|---|
| New York | 11,872 | 4,482 | 3,562 | 14.63% | 19.44% |
| Bronx | 7,166 | 2,876 | 2,150 | 32.28% | 42.03% |
| Westchester | 5,701 | 3,564 | 1,710 | 4.29% | 5.91% |
| Rockland | 1,757 | 1,142 | 527 | 4.33% | 5.19% |
| Putnam | 672 | 452 | 202 | 2.43% | 2.49% |
| | 27,168 [2] | 12,516 | 8,150 | | |

Percentage of Hispanics in Jury Wheel Study 17.07%

Notes: [1] For data in this schedule, see Chart dated May 15, 1996.
[2] The total is less than 27,539 because it excludes questionnaires that were returned to the Jury Administrator with notification that the intended recipient either died or moved.
[3] Calculated by multiplying throw-away rate by total number of QNs sent to county.

## SCHEDULE 2

### PERCENTAGE OF BLACKS AND HISPANICS IN JURY WHEEL STUDY BASED ON RETURNED QUESTIONNAIRES PLUS ESTIMATED NUMBER OF QUESTIONNAIRES IGNORED BY RECIPIENT

THROW–AWAY RATE USED: 20%

| County | Total QNs Sent to County [1] | # of QNs Returned from County | # of QNs Thrown Away in County [3] | % Ret. QNs Made up of Blacks | % Unret. QNs Made up of Blacks |
|---|---|---|---|---|---|
| New York | 11,872 | 4,482 | 2,374 | 16.62% | 25.10% |
| Bronx | 7,166 | 2,876 | 1,433 | 33.55% | 38.77% |
| Westchester | 5,701 | 3,564 | 1,140 | 7.59% | 14.81% |
| Rockland | 1,757 | 1,142 | 351 | 4.27% | 7.98% |
| Putnam | 672 | 452 | 134 | 1.24% | 1.58% |
| | 27,168 [2] | 12,516 | 5,434 | | |

Percentage of Blacks in Jury Wheel Study 18.86%

| County | Total QNs Sent to County [1] | # of QNs Returned from County | # of QNs Thrown Away in County [3] | % Ret. QNs Made up of Hispanics | % Unret. QNs Made up of Hispanics |
|---|---|---|---|---|---|
| New York | 11,872 | 4,482 | 2,374 | 14.63% | 19.44% |
| Bronx | 7,166 | 2,876 | 1,433 | 32.28% | 42.03% |
| Westchester | 5,701 | 3,564 | 1,140 | 4.29% | 5.91% |
| Rockland | 1,757 | 1,142 | 351 | 4.33% | 5.19% |
| Putnam | 672 | 452 | 134 | 2.43% | 2.49% |
| | 27,168 [2] | 12,516 | 5,434 | | |

Percentage of Hispanics in Jury Wheel Study 16.44%

Notes: [1] For data in this schedule, see Chart dated May 15, 1996.
[2] The total is less than 27,539 because it excludes questionnaires that were returned to the Jury Administrator with notification that the intended recipient either died or moved.
[3] Calculated by multiplying throw-away rate by total number of QNs sent to county.

## SCHEDULE 3

### PERCENTAGE OF BLACKS AND HISPANICS IN JURY WHEEL STUDY BASED ON RETURNED QUESTIONNAIRES PLUS ESTIMATED NUMBER OF QUESTIONNAIRES IGNORED BY RECIPIENT

THROW–AWAY RATE USED: 10%

| County | Total QNs Sent to County [1] | # of QNs Returned from County | # of QNs Thrown Away in County [3] | % Ret. QNs Made up of Blacks | % Unret. QNs Made up of Blacks |
|---|---|---|---|---|---|
| New York | 11,872 | 4,482 | 1,187 | 16.62% | 25.10% |
| Bronx | 7,166 | 2,876 | 717 | 33.55% | 38.77% |
| Westchester | 5,701 | 3,564 | 570 | 7.59% | 14.81% |
| Rockland | 1,757 | 1,142 | 176 | 4.27% | 7.98% |
| Putnam | 672 | 452 | 67 | 1.24% | 1.58% |
| | 27,168 [2] | 12,516 | 2,717 | | |

Percentage of Blacks in Jury Wheel Study 17.79%

| County | Total QNs Sent to County [1] | # of QNs Returned from County | # of QNs Thrown Away in County [3] | % Ret. QNs Made up of Hispanics | % Unret. QNs Made up of Hispanics |
|---|---|---|---|---|---|
| New York | 11,872 | 4,482 | 1,187 | 14.63% | 19.44% |
| Bronx | 7,166 | 2,876 | 717 | 32.28% | 42.03% |
| Westchester | 5,701 | 3,564 | 570 | 4.29% | 5.91% |
| Rockland | 1,757 | 1,142 | 176 | 4.33% | 5.19% |
| Putnam | 672 | 452 | 67 | 2.43% | 2.49% |
| | 27,168 [2] | 12,516 | 2,717 | | |

Percentage of Hispanics in Jury Wheel Study 15.58%

Notes: [1] For data in this schedule, see Chart dated May 15, 1996.
[2] The total is less than 27,539 because it excludes questionnaires that were returned to the Jury Administrator with notification that the intended recipient either died or moved.
[3] Calculated by multiplying throw-away rate by total number of QNs sent to county.

## SCHEDULE 4

### PERCENTAGE OF BLACKS AND HISPANICS IN JURY WHEEL STUDY BASED SOLELY ON RETURNED QUESTIONNAIRES

THROW-AWAY RATE USED: 0%

| County | Total QNs Sent to County [1] | # of QNs Returned from County | # of QNs Thrown Away in County [3] | % Ret. QNs Made up of Blacks | % Unret. QNs Made up of Blacks |
|---|---|---|---|---|---|
| New York | 11,872 | 4,482 | 0 | 16.62% | 25.10% |
| Bronx | 7,166 | 2,876 | 0 | 33.55% | 38.77% |
| Westchester | 5,701 | 3,564 | 0 | 7.59% | 14.81% |
| Rockland | 1,757 | 1,142 | 0 | 4.27% | 7.98% |
| Putnam | 672 | 452 | 0 | 1.24% | 1.58% |
| | 27,168 [2] | 12,516 | 0 | | |

Percentage of Blacks in Jury Wheel Study 16.26%

| County | Total QNs Sent to County [1] | # of QNs Returned from County | # of QNs Thrown Away in County [3] | % Ret. QNs Made up of Hispanics | % Unret. QNs Made up of Hispanics |
|---|---|---|---|---|---|
| New York | 11,872 | 4,482 | 0 | 14.63% | 19.44% |
| Bronx | 7,166 | 2,876 | 0 | 32.28% | 42.03% |
| Westchester | 5,701 | 3,564 | 0 | 4.29% | 5.91% |
| Rockland | 1,757 | 1,142 | 0 | 4.33% | 5.19% |
| Putnam | 672 | 452 | 0 | 2.43% | 2.49% |
| | 27,168 [2] | 12,516 | 0 | | |

Percentage of Hispanics in Jury Wheel Study 14.36%

Notes: [1] For data in this schedule, see Chart dated May 15, 1996.
[2] The total is less than 27,539 because it excludes questionnaires that were returned to the Jury Administrator with notification that the intended recipient either died or moved.
[3] Calculated by multiplying throw-away rate by total number of QNs sent to county.