**UNITED STATES of America, Appellee,**

v.

**Mark BAHNA and Armindo Soares, Defendants–Appellants.**

No. 1369, Docket 94–1566.

United States Court of Appeals, Second Circuit.

Argued June 29, 1995.

Decided Oct. 5, 1995.

**20**

Barbara D. Underwood, Chief Assistant United States Attorney, Eastern District of New York, Brooklyn, New York (Zachary W. Carter, United States Attorney, Peter A. Norling, Joseph Nocella, Assistant United States Attorneys, Eastern District of New York, Brooklyn, New York, of counsel), for Appellee.

Judd Burstein, New York City (Kim P. Bonstrom, New York City, of counsel), for Defendant–Appellant Soares.

Before: VAN GRAAFEILAND, MINER, Circuit Judges, and COTE, District Judge.*

VAN GRAAFEILAND, Circuit Judge:

In June 1990, Armindo Soares was convicted after a jury trial in Brooklyn of conspiring and attempting to possess cocaine with intent to distribute. On July 31, 1991, Judge Raggi, before whom the case was tried, ordered a new trial because of what Judge Raggi concluded was an erroneous ruling concerning character evidence. In March 1994, Soares was retried before Chief Judge Platt in Uniondale and again was convicted. Once more, Soares contends that the verdict was tainted. However, this time his contention is without merit.

Although Soares describes the case against him as a close one, he does not, and reason-ably cannot, argue that the evidence viewed in the light most favorable to the Government was insufficient to support the verdict. The Government established, largely through the testimony of coconspirators, that Soares and his brother-in-law, Mark Bahna, were involved in a large-scale cocaine trafficking network. One witness testified that he had seen Soares buying cocaine and had been asked repeatedly by Soares whether he had heard anything about a cocaine shipment. The witness also had been told by another coconspirator that Soares was in the business of selling cocaine and that a local organized crime figure, Rocco Arena, was attempting to extort "tribute" from Soares for encroaching on Arena's territory. Another witness testified that he had discussed prices, quality and brands of cocaine with defendant and Bahna, and that he had seen defendant purchase cocaine from Bahna and once return about 800 grams of cocaine to Bahna, stating that his customers were complaining about the quality. The witness also testified that he and Bahna were stopped by Arena, who told Bahna that Soares had to pay tribute, and that Soares had refused to do so. The witness later learned that one of Soares' employees had been pistol-whipped because of Soares' refusal. A third witness testified that Bahna once warned him not to mention prices in front of Bahna's wife, Soares' sister, because Bahna sold cocaine to Soares at a higher price. He also testified that Bahna once mentioned that some of the cocaine he was purchasing was for Soares. In addition, the Government introduced several incriminating tape recordings of conversations between Bahna and one of his coconspirators.

In January 1990, the Drug Enforcement Administration, acting on information furnished by an informant, Ralph Bencivengo, decided to organize a sting operation involving Bahna. With Bencivengo's assistance, the DEA set up a sale of ten kilograms of sham cocaine to Bahna. On January 4, 1990, the DEA conducted surveillance at the site of the planned sale, a shopping center in Brooklyn. At 8:00 p.m., Bahna arrived at the parking lot in Soares' car, driven by Soares.

---

* The Honorable Denise Cote of the United States District Court for the Southern District of New York, sitting by designation.

Bahna temporarily left the car to meet with Bencivengo. Then they both entered the car and continued negotiating the cocaine sale. After Bahna and Bencivengo placed a call at a pay telephone, the deal was postponed.

Bencivengo told the DEA agents that during these incidents Soares brandished a gun and threatened Bencivengo's life if he was wired. Bencivengo stated further that the deal fell through because Bahna insisted upon seeing a sample of the cocaine to determine its quality, while Bencivengo insisted upon seeing the $145,000 purchase money first.

On January 9, the sham deal was consummated. However, defendant was not present at that time. Instead, William Lombard was with Bahna. Both Lombard and Bahna were arrested, and defendant was arrested thereafter.

The Government did not call Bahna as a witness. Defendant's first claim of error is addressed to the district court's "absent witness" instruction relating to Bahna's nonappearance. At the conclusion of the Government's case, Soares' counsel called as his sole witness a DEA agent, who already had testified, and counsel then rested. He thereafter submitted among others the following request to charge:

> If you find that a witness was either equally available or unavailable to both sides, you may infer that the testimony of the uncalled witness might have been unfavorable to the Government or to the defendant or to both. Alternatively, if the witness was unavailable to both the prosecution and the defense, you may simply disregard his possible testimony as a factor in this case.

> You should, however, remember that there is no duty on either side to call a witness whose testimony would merely repeat or duplicate testimony already in evidence. You should also recall my earlier instruction that the law never compels a defendant in a criminal case to call any witnesses or produce any evidence in his behalf.

■ This requested instruction was taken verbatim from an accepted treatise on federal jury instructions. However, insofar as it refers to equally unavailable witnesses in the leading sentence, it does not jibe with the "available witness" rationale and we find no case law to support it. Indeed, the only pertinent Second Circuit authority we have uncovered is directly to the contrary. *See United States v. Brown*, 511 F.2d 920, 925–26 (2d Cir.1975); *United States v. Super*, 492 F.2d 319, 323 (2d Cir.), *cert. denied sub nom. Burns v. United States*, 419 U.S. 876, 95 S.Ct. 139, 42 L.Ed.2d 115 (1974). Moreover, there was no factual basis for an instruction concerning "equally unavailable" witnesses and "[o]rdinarily it is a mistake to give instructions on subjects not directly in issue in a case." *Clark v. Pennsylvania R.R.*, 328 F.2d 591, 595 (2d Cir.) (quoted with approval in *De Chico v. Metro–North Commuter R.R.*, 758 F.2d 856, 861 (2d Cir.1985) and *O'Connell v. National R.R. Passenger Corp.*, 922 F.2d 1039, 1044 (2d Cir.1991)), *cert. denied*, 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964). Assuming for the sake of argument that the form instruction concerning equally unavailable witnesses might be appropriate in some cases, this was not such a case. Here, the charge could only be confusing and misleading. *See* 9A Wright & Miller, *Federal Practice and Procedure* § 2556 (1995). "[A] failure to grant a request for instructions that are in any respect incorrect and unsound does not constitute error." *Clark, supra*, 328 F.2d at 595. In short, we think it would have been error for the district court to have charged the jury that it could draw an inference against either party for failing to call a witness who was not available to be called. As stated by Judge Friendly in *United States v. Leonard*, 524 F.2d 1076, 1084 (2d Cir.1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1737, 48 L.Ed.2d 202 (1976), "[I]t is elementary that to put a trial court in error for declining to grant a requested charge, the proffered instructions must be accurate in every respect." The proposed charge herein did not satisfy this criterion.

In any event, the district court told defense counsel, "If you wish I will give an uncalled witness equally available charge, my charge on that." Thereafter, the court charged the jury as follows:

There are several other persons whose names you have heard during [the] course of this trial and one or more of the attorneys have referred to their absence from this trial. Neither the defendant nor the government could benefit from the absence of such witnesses ... because each side has an equal opportunity, or lack of opportunity, to have them testify. If either side had wanted any of them here, so far as the record shows, they had equal opportunity to get them and absence should not affect your judgment in passing on this case or in determining the guilt or innocence of the defendant.

Bear in mind, of course, that the law never imposes upon the defendant in a criminal case the burden of producing or calling any witnesses or producing any evidence.

■ Defense counsel argues that this was reversible error. We disagree. When a witness equally available to both sides is not called by either, the trial court may in its discretion give one of two charges: (1) the court may instruct the jury that no unfavorable inference can be drawn against either side; or (2) the court may instruct the jury that under the circumstances the jury may draw an unfavorable inference against both sides. *See United States v. Erb*, 543 F.2d 438, 444–45 (2d Cir.), *cert. denied*, 429 U.S. 981, 97 S.Ct. 493, 50 L.Ed.2d 590 (1976). A review of decisions from other circuits discloses that the majority of them favor the first alternative, i.e., no unfavorable inference against either side. *See, e.g., United States v. Currier*, 454 F.2d 835, 839 (1st Cir.1972); *United States v. Busic*, 587 F.2d 577, 586 (3d Cir.1978), *rev'd and remanded on other grounds*, 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980); *United States v. Fisher*, 484 F.2d 868, 870 (4th Cir.1973), *cert. denied*, 415 U.S. 924, 94 S.Ct. 1428, 39 L.Ed.2d 480 (1974); *United States v. Chapman*, 435 F.2d 1245, 1247 (5th Cir.1970), *cert. denied*, 402 U.S. 912, 91 S.Ct. 1392, 28 L.Ed.2d 654 (1971); *Rostello v. United States*, 36 F.2d 899, 902 (7th Cir.1929); *Johnson v. United States*, 291 F.2d 150, 155 (8th Cir.), *cert. denied*, 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961); *Wagner v. United States*, 264 F.2d 524, 531 (9th Cir.), *cert. denied*, 360 U.S. 936, 79 S.Ct. 1459, 3 L.Ed.2d 1548 (1959).

It is not surprising, therefore, that this "no unfavorable inference" charge is the one that has been adopted by Devitt, Blackman, Wolff & O'Malley in their authoritative work, 1 *Federal Jury Practice and Instructions* § 14.15, at 458 (1992). Chief Judge Platt told counsel that he had been using this charge for twenty years.

As pointed out in *United States v. Erb, supra*, the various panels of this Court have not spoken with one voice in their choice of one or the other of the two above alternatives. Although the *Erb* panel stated its belief that the second alternative was the "more logical view," 543 F.2d at 444, it also stated that it would be "loath indeed to reverse" a conviction because of a district court's discretionary choice of the first alternative. *Id.* at 445. Indeed, as we subsequently pointed out in *United States v. Torres*, 845 F.2d 1165, 1171 (2d Cir.1988), the *Erb* court affirmed the judgment of conviction at issue therein despite the fact that the district court gave the jury the "no unfavorable inference" charge. Where, as in the instant case, the district court instructs the jury that the defendant is not compelled to produce any witnesses, there may be some question as to which of the two alternative charges would be the more logical. We see no need to debate that issue here, as either charge passes muster.

■ There is no merit in the contention of defendant's counsel that his client was prejudiced because the district court did not give the second alternative charge after counsel had carped at some length in his summation about the asserted failure of the Government to produce evidence and call witnesses. The district court adequately covered the point as follows:

The law does not require the prosecution to call as witnesses all persons who may have been present at any time or place involved in the case, or who may appear to have some knowledge of the matters in issue at this trial. Nor does the law require the prosecution to produce as exhibits all papers and things mentioned in the evidence.

However, in judging the credibility of the witnesses who have testified, and in considering the weight and effect of all evidence that has been produced, the jury may consider the prosecution's failure to call other witnesses or to produce other evidence shown by the evidence in the case to be in existence and available.

Soares' second contention is that the district court erred in refusing to let in statements allegedly made by Bahna to a DEA agent tending to show that Soares was an innocent participant in the January 4, 1990 transaction. The district court rejected this evidence unless Soares consented to the admission of evidence that Bahna subsequently recanted these statements. Soares declined the district court's offer.

■ In determining whether the district court erred in thus conditioning the admissibility of the exculpatory evidence, we first must determine whether the evidence otherwise would be admissible. We hold that it would not. Testimony by the DEA agent concerning statements made to him by a non-testifying coconspirator would be hearsay unless the statements were made during the course of and in furtherance of the conspiracy. *See United States v. Tracy,* 12 F.3d 1186, 1196 (2d Cir.1993); *United States v. Innamorati,* 996 F.2d 456, 481 (1st Cir.1993). Objections to statements as hearsay are not solely the prerogative of the defendant. *United States v. Winters,* 33 F.3d 720, 723 (6th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1148, 130 L.Ed.2d 1107 (1995); *see also United States v. Thomas,* 11 F.3d 1392, 1399 (7th Cir.1993); *United States v. Lloyd,* 10 F.3d 1197, 1216–17 (6th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1569, 128 L.Ed.2d 213 (1994). Because the district court could have precluded the testimony of Bahna's exculpatory statements, it did not err in conditioning its admissibility as it did. The district court quite properly believed that the jury should get the complete picture concerning Bahna's hearsay statements. *See, e.g., United States v. Fayette,* 388 F.2d 728, 735 (2d Cir.1968). Describing defense objections as "gamesmanship," the district court told defense counsel: "You don't get

half a loaf. You want to bring out the loaf you bring out the whole loaf."

■ We need spend little time discussing defendant's third claim of error which is based upon the district court's exclusion of two tape-recorded conversations between Bahna and Bencivengo. In these conversations, Bahna expresses a reluctance to meet with Bencivengo to discuss drug matters because Bahna has to pick up Soares at the airport. Soares argues that this was evidence of an unwillingness on Bahna's part to discuss drugs in Soares' presence. The district court refused to admit the conversations because the reason for Bahna's reluctance was speculative. We agree.

As the reason for not wanting to meet with Bencivengo, Bahna stated: "I can't do it because they [Soares and another unknown person] are gonna be in the car. For me to come all the way to this neighborhood is ridiculous, I want to take the Van Wyck [Expressway]. I don't want to have to come all the way back." Based on this statement, it appears that the reason for Bahna's hesitance was simply that he did not want to drive out of his way to meet the informant while transporting passengers. If so, the statement could be excluded as irrelevant under Fed.R.Evid. 401. At best, the cause for Bahna's reluctance was speculative, in which case the conversations could be excluded under Fed.R.Evid. 403. In any event, the district court's ruling did not constitute a prejudicial abuse of discretion.

Soares' final argument is that the district court erred in selecting the jury from the "Long Island Division" jury wheel. Again, we disagree. United States district courts in New York State are divided among four districts. 28 U.S.C. § 112. Each of them contains so-called jury "divisions," i.e., "counties, parishes, or similar political subdivisions surrounding the places where court is held." 28 U.S.C. § 1869(e). Each of them selects grand and petit juries pursuant to a plan adopted by the judges of the district and approved by the Judicial Conference of the Second Circuit, and, as a general rule, selections are made from the area surrounding the courthouse where the case is to be tried. For example, in the Northern District, which

covers thirty-two counties, court may convene in any one of six cities, each in a different county. Under the District Rules, jurors are selected from the "division" in which the court sits. *See* Northern District General Rule 47.1. For cases tried in Syracuse, for example, jurors are drawn from Madison, Onondaga and Oswego Counties. For cases tried in Auburn, which is less than thirty miles from Syracuse, jurors are drawn from Cayuga, Cortland and Tompkins Counties.

In the Southern District, which covers eight counties but whose principal locus is Manhattan, jury panels for the district's supplemental court in White Plains are drawn from six counties, none of which is in Manhattan. *See* Rule 31 of the Division of Business Among District Court Judges; Southern District.

In the Western District, where trials are held in either Buffalo or Rochester, jury panels are drawn from the eight counties nearest Buffalo for trials in that city and the nine counties nearest Rochester for trials in that city.

The Eastern District consists of the counties of Kings, Nassau, Queens, Richmond and Suffolk. In 1948, when Title 28 of the United States Code was enacted, Congress provided that "Court for the Eastern District shall be held at Brooklyn." *See* Judicial Code and Judiciary Act of 1948, ch. 646, § 112, 62 Stat. 869, 886. As the character of the district changed over the years, Congress deemed it advisable to provide for additional court facilities, and the present statute, 28 U.S.C. § 112(c), provides that court shall be held in Brooklyn, Hauppauge and Hempstead (including the Village of Uniondale). According to the 1993–94 Second Circuit Redbook, three Eastern District judges were stationed in Uniondale and one in Hauppauge.

In 1985, the judges of the Eastern District proposed a jury plan which provided in substance that jurors for the Brooklyn court would be drawn from the entire Eastern District but that jurors for the "Long Island Division" [Hauppauge and Hempstead (Uniondale) ] would be drawn from Nassau and Suffolk Counties. *See In re Jury Plan of the*

*Eastern Dist. of New York,* 27 F.3d 9–10 (2d Cir.1994). This plan was approved by the Judicial Council on July 1, 1985 and at least with respect to the Long Island Division, it was still in effect in 1994 when the instant case was tried.

■ As the foregoing paragraphs demonstrate, the use of "division" jury panels was not unique in the Eastern District. The Judicial Council's approval of the separate Long Island Division jury wheel is not binding on this Court. However, in the absence of greater proof than has been presented herein, we are not prepared to say that the Judicial Council erred in its approval. It is well-settled that neither the jury selection statute nor the Constitution requires that jurors be drawn from an entire district. *See Lewis v. United States,* 279 U.S. 63, 72, 49 S.Ct. 257, 260, 73 L.Ed. 615 (1929) (citing *Ruthenberg v. United States,* 245 U.S. 480, 482, 38 S.Ct. 168, 169, 62 L.Ed. 414 (1918)); *see also United States v. Titus,* 210 F.2d 210, 212–13 (2d Cir.1954); *United States v. Garces,* 849 F.Supp. 852, 856–57 (E.D.N.Y. 1994), and cases cited therein.

■ Soares admits, as he must, that there was no improper purpose or design in the creation of the Long Island Division jury wheel. *See United States v. Macchia,* 844 F.Supp. 920, 921 (E.D.N.Y.1994). His argument in brief is that as of 1994 there was an under-representation of blacks and Hispanics in the Long Island Division as compared with the Eastern District as a whole. Putting aside for the moment the absence of evidentiary support for this argument, we suggest that it is based upon an improper premise. Where a jury venire is drawn from a properly designated division, we look to that division to see whether there has been any unlawful or unconstitutional treatment of minorities.

In the seminal case of *United States v. Gottfried,* 165 F.2d 360 (2d Cir.), *cert. denied,* 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948), Judge Learned Hand expressed this principle as follows:

[D]istrict and circuit courts have had power since the first Judiciary Act of 1789 to divide a district territorially in the interest

of an impartial trial, of economy, and of lessening the burden of attendance. There cannot be the faintest question of the constitutionality of this statute; the courts have again and again recognized its validity. Furthermore, it would be impossible in practice to administer it, if it were a condition that the divisions made must be so homogeneous that they showed an equal percentage of all possible groups. There are probably no districts in the Union, which can be divided without disclosing in the sections different racial, religious, political, social or economic percentages. To demand that they shall not, would be a fantastic pedantry which would serve no purpose and would put an end to the statute.

*Id.* at 364. For a further exposition of these principles *see United States v. Herbert,* 698 F.2d 981 (9th Cir.), *cert. denied,* 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983), where the Court said:

The Jury Selection and Service Act specifically provides for splitting a district into divisions and using only one division's jury wheel for petit juries:

"[A]ll litigants in Federal court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district *or division wherein the court convenes.*"

28 U.S.C. § 1861 (emphasis added). A petit jury may be drawn constitutionally from only one division and not the whole district. *Ruthenberg v. United States,* 245 U.S. 480, 38 S.Ct. 168, 62 L.Ed. 414 (1918); *United States v. Cates,* 485 F.2d 26, 29 (1st Cir.1974). *See also United States v. Smith,* 463 F.Supp. [680, 685 (E.D.Wis. 1979)].

Appellant John Herbert argues that there is a lower percentage of Native Americans in the Phoenix Division than in the Prescott Division, and that the failure to transfer the case to the Prescott Division shows a systematic exclusion of Native Americans. As stated above, it is proper to draw a petit jury from only one division. Appellant made no showing that Native Americans within the single Phoenix Division were systematically excluded. The jury selection plan for the Phoenix Division was therefore constitutional.

*Id.* at 984. *See also Davis v. Warden, Joliet Correctional Inst. at Stateville,* 867 F.2d 1003, 1010–1011 (7th Cir.), *cert. denied,* 493 U.S. 920, 110 S.Ct. 285, 107 L.Ed.2d 264 (1989); *United States v. Test,* 550 F.2d 577 (10th Cir.1976); *United States v. Jenkins,* 496 F.2d 57, 65 (2d Cir.1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1119, 43 L.Ed.2d 394 (1975); *United States v. Garces, supra,* 849 F.Supp. at 852, 856–58; *Jeffers v. United States,* 451 F.Supp. 1338, 1345–46 (N.D.Ind. 1978).

The foregoing discussion assumes that the argument Soares now makes was properly presented to the district court and preserved for review by this Court. It was not. As above stated, the jury selection plan at issue was in effect for at least nine years before the instant case was reached for trial. The case was assigned to Chief Judge Platt two years prior to the date of trial. No motions addressed to the assignment, the place of trial or the method of jury selection were made during that period. Rule 50.2(f) of the Guidelines for the Division of Business for the Eastern District of New York provides in substance that any objection by a party to the designation of a judge or the place of trial in a criminal case must be made within ten days from the arraignment or from the initial notice of appearance, whichever is earlier.

The case against Soares and the coconspirator, William Lombard, was scheduled to go to trial before Chief Judge Platt on March 14, 1994.[1] By letter to Chief Judge Platt dated March 9, 1994, Soares' counsel referred to an article in the New York Law Journal which discussed in summary fashion a decision in a case involving a Brooklyn defendant, which apparently held that the Brooklyn defendant was entitled to have his jury drawn from Kings, Queens and Richmond Counties rather than from the district as a whole. Based solely on that newspaper article, Soares requested that the jury in the

---

1. Lombard pled guilty at the outset of trial and the trial proceeded against Soares alone.

instant case "be culled only from Kings, Queens and Richmond Counties." No evidence was submitted in support of Soares' application. In an appearance before the district court on March 11th, three days prior to the scheduled trial date, at which counsel for codefendant William Lombard was not present, Soares' counsel stated that he was not challenging the assignment of the case to Chief Judge Platt. Counsel's position was that although the case was to be tried in Uniondale, it should be treated as though it was being tried in Brooklyn.

When informed by the district court that the creation of a new jury wheel covering only the counties of Kings, Queens and Richmond might take anywhere from three to six months, defense counsel changed his request from a three-county panel to a district-wide panel, if that could be accomplished in Uniondale, and otherwise the case be transferred to Brooklyn. Either alternative involved a departure from the Council-approved jury selection rules as they applied to Uniondale and as they apparently were interpreted to apply in Brooklyn. Moreover, transfer of the case to Brooklyn admittedly would result in substantial delay. As the prosecutor informed the court, this would be prejudicial to the Government in that the prosecutor had four cooperating witnesses on tap for the March 14th trial, two of whom had been relocated in other parts of the country because of their entry into the witness protection program and a third of whom was in custody. Section 1867(a) of 28 United States Code, which requires that challenges to jury panels be made promptly, was designed to prevent such prejudicial delay, and there is no good reason why its provision should not be enforced. *See United States v. Maldonado*, 849 F.2d 522, 523 (11th Cir.1988); *United States v. Goetz*, 826 F.2d 1025, 1029 (11th Cir.1987). This is particularly true where, as here, Soares' application was made without competent evidence to show that Soares could not get a fair trial in Uniondale. *See Goetz, supra*, at 1029.[2]

Having found no prejudicial error that would entitle Soares to a third trial, we affirm.

---

**2.** Because the Eastern District stretches over 150 miles in an area rife with traffic and transportation problems, it is not an ideal location for a district-wide jury wheel. As a result, there is a split of opinion among both judges and attorneys as to whether such a wheel should be adopted for all federal courts in the district. On July 17, 1995, the Judicial Council of the Second Circuit approved a one-year conditional plan for a district-wide pool covering all seats of the Eastern District courts. *See In re Jury Plan of the Eastern District of New York*, 61 F.3d 119 (1995). The conditional nature of the approved plan is indicative of the fact that it was not statutorily or constitutionally mandated in the instant case.