**UNITED STATES of America**

v.

**Trevor JOHNSON, Robert Carnes, a/k/a "Jamal," Dennis McCall, a/k/a "B–Boy," Daniel Hunter, a/k/a "Tyborne," and Eric Mulder, a/k/a "Unique," Defendants.**

**No. S1 98 Cr. 45(RCC).**

United States District Court, S.D. New York.

Aug. 27, 1998.

Elliot R. Press, Brooklyn, NY, Stephen P. Scaring, Garden City, NY, for Trevor Johnson.

Marilyn S. Reader, Larchmont, NY, Julie Prag Vianale, White Plains, NY, Julie Vianelli, Briccetti & Calhoun, White Plains, NY, for Robert Carnes.

Anthony J. Ferrara, Polstein & Ferrara, New York City, for Dennis McCall.

Andrew A. Rubin, Mancuso, Rubin & Fufidio, White Plains, NY, Howard J. Herman, New York City, Amy Margaret Attias, Pleasantville, NY, for Daniel Hunter.

David G. Secular, New York City, for Eric Mulder.

## MEMORANDUM AND ORDER

CASEY, District Judge.

*Background*

Defendants Trevor Johnson (hereinafter "Johnson"), Robert Carnes, a/k/a "Jamal" (hereinafter "Carnes"), Dennis McCall, a/k/a "B–Boy" (hereinafter "McCall"), Daniel Hunter, a/k/a "Tyborne" (hereinafter "Hunter") and Eric Mulder, a/k/a "Unique" (hereinafter "Mulder"), were indicted in January, 1998, on one count of conspiracy to extort money from several construction companies, in violation of 18 U.S.C. § 1951(b)(2). Three other related indictments were handed down the same day, all related to activities of the Gambino crime family. In July, 1998, the government superceded this indictment with S1 98 Cr. 45 ("S1"), which contains two counts. Count one charges all five defendants with conspiracy to commit extortion and to obstruct, delay and affect commerce, in violation of 18 U.S.C. §§ 1951(b)(2) and 1951(b)(3), and details more overt acts than the original indictment. Count two charges defendants Johnson, Carnes and McCall with extortion and obstructing, delaying and affecting commerce, in violation of 18 U.S.C. §§ 1951(b)(2) and 1951(b)(3).

Defendants Johnson and McCall have jointly filed a motion, which defendants Hunter and Carnes join, seeking to dismiss the indictment and to stay further proceedings in this case because they claim the selection process for White Plains grand and petit juries violates their Fifth and Sixth Amendment rights, along with the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 *et seq.* Defendants claim that the selection process results in the underrepresentation of blacks and Hispanics in the White Plains Master Wheel. Defendants Johnson, McCall, Hunter and Carnes have also made motions asking the Court to compel the government to provide them with a bill of particulars. Defendants McCall and Hunter have made motions seeking to be severed from the rest of their co-defendants. Defendant Johnson has made a motion seeking severance specifically from defendant Eric Mulder, which is joined by defendant Carnes. Defendant Hunter also has made a motion asking the court to preclude certain tape recorded conversations. These motions were filed before the S1 indictment was filed, but they are deemed applicable to the S1 indictment.

For the reasons set forth below, defendants' motions to dismiss the indictment and stay the proceedings are denied. Defendants' motions for a bill of particulars is granted in part and denied in part. Defendants' motions for severance are denied. Defendant Hunter's motion to preclude is denied with leave to renew.

### 1. Jury Selection

Defendants Johnson and McCall, joined by defendants Carnes and Hunter, ask this Court to dismiss the current indictment and stay the proceedings in this case, claiming that the selection process for the grand and petit juries for the Southern District of New York is in violation of the Equal Protection Clause of the Fifth Amendment, the defendants' Sixth Amendment right to an impartial jury and the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861, *et. seq.* (hereinafter "Jury Act").

This jury selection process is detailed in the Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York (hereinafter "Jury Plan"). *See* Beveridge Aff. Exh. B. For the purposes of selection of grand and petit jurors, the Southern District is divided into two overlapping divisions, the White Plains division and the Foley Square division. Defendants claim that the configuration of these two jury divisions creates a jury pool in the White Plains division that does not adequately represent the black and Hispanic populations in the "community".

Juries in the Southern District are selected as follows. In the year after each presidential election, the Jury Administrator obtains voter registration lists for the eight counties comprising the Southern District. The total number of registered voters in the District, including New York (Manhattan), Bronx,

Westchester, Rockland, Putnam, Dutchess, Orange and Sullivan counties, was 2,487,567 for the 1996 presidential election, on which the current master wheels are based. Not every registered voter is used for jury selection, however. Because the District has limited computer capacity and does not need all the registered voters to create its master wheels, the Court uses only a portion of the names.

The voters in the District are separated by county, and from these lists, two master jury wheels are created, one for White Plains, and one for Foley Square. The Foley Square Master Wheel is comprised of New York (Manhattan), Bronx, Westchester, Rockland and Putnam counties. Voters from these five counties are selected at random to fill the Foley Square Master Wheel. For the current Foley Square Master Wheel, 713,800 jurors were selected, taken from each county in proportion to the number of registered voters in each of the five counties for the 1996 presidential election. The White Plains Master Wheel is comprised of voters from

the counties of Westchester, Rockland, Putnam, Dutchess, Orange and Sullivan (hereinafter the "northern six counties"). Voters from each of these counties are selected at random for the White Plains Master Wheel in proportion to the number of registered voters in each of these northern six counties, totaling 346,458 for the current master wheel.

These master wheels are constructed every four years and supply the pool of potential jurors for grand and petit juries for those four years. They are supplemented, according to the plan, should the court need more names in that four year period. The current master wheels were constructed in September, 1997, and will be used until new master wheels are constructed after the next presidential election in 2000.

The Plan mandates that each master wheel contain voters proportionally represented in relation to the other counties in that division. *See* Jury Plan, Article IV.B.[1] The current master wheels reflect this goal.[2] The South-

---

**1.** The Court notes that there is one section in the Jury Plan that differs from the manner in which juries are actually selected in this district. Article III.A.1. states in part, "[t]he number of names to be drawn from each county shall be substantially in the same proportion to the total number drawn from all eight counties as the number of names on that county's registration list bears to the total number of names on the lists of all eight counties." Jury Plan, Article.III.A.1. This sentence is included in the section describing how the Jury Administrator calculates the "quotient", a number used for randomly selecting jurors. *Id.* This section does not reflect the manner in which registered voters are actually divided between the two master wheels.

Despite the presence of the above sentence in the Jury Plan, Article IV.B. of the plan details the manner in which the Jury Plan is actually implemented, dividing the jurors between two master wheels, with each county proportionally represented within each division's master wheel. Article.IV.B. states in part that "[e]ach of the said eight counties shall be obliged to furnish its 'quotient' of names needed for the Master Jury Wheels." *Id.*, Article.IV.B. This sentence, referring to the master jury wheels in the plural, contemplates that the "quotient" be calculated for each of the two master wheels. The section goes on to state that, "[t]he jurors drawn for service from the counties of Westchester, Putnam and Rockland shall be then divided between the Manhattan and White Plains Qualified Wheels. *Such division of jurors from each of the counties of Westchester, Putnam and Rockland shall rea-*

*sonably reflect the relative number of registered voters in each county within the respective Master Jury Wheels." Id.,* Article.IV.B. (emphasis added).

Thus, this Court finds that even though the Jury Plan contains some contradictory language, Article.IV.B. of the plan contemplates the division of potential jurors proportionally within each division, rather than proportionally to the district as a whole, and this is in fact how the Southern District's jury selection process is conducted. The existence of this contradictory language in the Jury Plan does not affect the validity of the jury selection process itself. Therefore, this Court's analysis will be limited to the manner in which the selection process is actually conducted. As stated *infra,* the manner in which the jury selection process in the Southern District is actually conducted does not violate the Constitution or the Jury Act. This Court recommends, nevertheless, that the Jury Plan be amended to eliminate the aforementioned inconsistency.

**2.** *See* Beveridge Aff. Exh. J, Letter of Robert Rogers, Jury Administrator, dated Oct. 23, 1997, which lists the following statistics:

> 1. On the Foley Square wheel, the percentages of registered voters from each county in the division [of the southern five counties] and the percentages of jurors on the Foley Square master wheel, listed in that order, are as follows: New York (Manhattan) 41 .0%/41.0%; Bronx 26.6%/26.6%; Westchester

ern District has found it necessary, however, to include three counties, Westchester, Rockland and Putnam, in both master wheels. This is because the Foley Square Courthouse has a need for jurors greater than could be supplied solely by Manhattan and the Bronx. The result of this overlap is that if one combines the numbers in the master wheels for Foley Square and White Plains, Westchester, Rockland and Putnam counties are represented in the Southern District as a whole in greater proportions than the other counties. These three counties are nearly perfectly represented, however, in each of the respective divisions. *See* note 2, *supra*.

### a. Sixth Amendment

■ The Supreme Court has interpreted the Sixth Amendment's guarantee of "a speedy and public trial by an impartial jury" to entitle defendants in criminal cases to juries chosen from panels that represent a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 526–29, 538, 95 S.Ct. 692, 695–97, 701, 42 L.Ed.2d 690 (1975). The Jury Act extends this requirement to the selection of grand juries as well. 28 U.S.C. § 1861 (1994). A defendant attempting to establish a prima facie violation of this requirement must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). *See also United States v. Jackman*, 46 F.3d 1240, 1245–46 (2d Cir.1995).

22.6%/22.6%; Rockland 7.2%/7.2% and Putnam 2.4%/2.4%.

2. On the White Plains wheel, the percentages of registered voters from each county in the division [consisting of the northern six counties] and the percentages of jurors on the White Plains master wheel, listed in that order, are as follows: Westchester 46.7%/46.6%; Rockland 14.8%/14.8%; Putnam 5.0%/5.0%;

Because courts have held that blacks and Hispanics are "distinctive" groups in the community, the defendants easily meet the first of the three *Duren* factors required to establish a prima facie violation of the Sixth Amendment. *Jackman*, 46 F.3d at 1246. In considering the second *Duren* element, the Court must determine "whether either or both of these two 'distinctive' groups are 'significant[ly] underrepresent[ed]' in the jury selection process." *Id.* (citing *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990) *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991) (alteration in original)).

■ Defendants have failed, however, to satisfy the second prong of this test, as they have not presented any evidence that the White Plains Master Wheel does not represent a fair and reasonable cross-section of the community. In fact, defendants do not even argue that the White Plains Master Wheel does not adequately reflect the relevant population [3] of the northern six counties that comprise the White Plains jury division. Instead, they base all their conclusions on the erroneous assumption that the only proper community for the White Plains courthouse is the entire Southern District.

This Court finds that the proper community or division for the White Plains courthouse, for the purposes of jury selection, has been properly designated as the northern six counties of the Southern District. It is well-settled that neither the Constitution nor the Jury Act requires that jurors be drawn from an entire district. *United States v. Bahna*, 68 F.3d 19, 24 (2d Cir.1995). *See also Lewis v. United States*, 279 U.S. 63, 72, 49 S.Ct. 257, 73 L.Ed. 615 (1929); *Ruthenberg v. United States*, 245 U.S. 480, 482, 38 S.Ct. 168, 62 L.Ed. 414 (1918). Although the *Duren* court did not clearly define the term "community," it is generally accepted that

Orange 15.1%/15 .1%; Dutchess 13.8%/13.8%; and Sullivan 4.3%/4.4%.

3. The percentages of blacks and Hispanics who are voting-age citizens in the division or community of the Court is the relevant population to compare to the percentages of blacks and Hispanics in the jury pool. *United States v. Reyes*, 934 F.Supp. 553, 565 (S.D.N.Y.1996).

the term refers to the district or division where the trial is to be held. *See United States v. Kenny,* 883 F.Supp. 869, 874 (E.D.N.Y.1995). It is also well-settled that a division need not be an official division drawn by Congress to be considered a proper division for the purposes of jury selection. *United States v. Gottfried,* 165 F.2d 360, 364–65 (2d Cir.), *cert. denied,* 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948). Defendants' expert, Dr. Andrew Beveridge, cites a variety of ways of defining community, such as Census Bureau definitions of metropolitan areas and market research companies' definitions of media markets. These examples prove little except to show that there are many acceptable methods of defining a community, especially when the definition will be used for different purposes.

Jurors from Orange, Sullivan and Dutchess counties are not required to serve at Foley Square in order to lessen the burden of attendance on jurors from these counties.[4] This is a permissible reason for such a division, for "when defining the community from which the jury must be drawn, the court or legislature may consider convenience to the jurors." *Davis v. Warden, Joliet Correctional Institution at Stateville,* 867 F.2d 1003, 1012 (7th Cir.), *cert. denied,* 493 U.S. 920, 110 S.Ct. 285, 107 L.Ed.2d 264 (1989) (citation omitted). Jurors from the middle three counties, Westchester, Rockland and Putnam, serve both in White Plains and in Foley Square. This overlap is the result of a need for jurors in the Foley Square courthouses greater than could be supplied solely from the Bronx and Manhattan, due to the large volume of cases filed there. *United States v. Yonkers Contracting Company, Inc.,* 682 F.Supp. 757, 767 (S.D.N.Y.1988) (finding that sending a portion of the jurors from the middle three counties to Foley Square was necessary because "Manhattan gets a disproportionately high share of the nation's (and even the world's) litigation").

The percentage of potential jurors from each of the northern six counties in the White Plains Master Wheel is equal to the percentage of registered voters each county supplies to the total for the northern six counties. *See* note 2, *supra.* Similarly, jurors from each of the five counties comprising the Foley Square jury wheel are represented in a percentage equal to the percentage of registered voters each county supplies to the total for these five counties. *See* note 2, *supra.* Thus, in each division, each county is proportionally represented in that division's master wheel.

Because the two divisions overlap, the three middle counties supply jurors to both master wheels. Thus, when one compares the percentage of registered voters each county supplies to the Southern District as a whole, these three counties are dispro-

---

4. Defendant cites statistics from a Census Bureau survey which suggest that traveling to Manhattan from Orange, Sullivan and Dutchess counties may not be more burdensome than traveling to White Plains. *See* Beveridge Aff. ¶ 42. These statistics are highly questionable. They are based on a sampling of answers given in response to Census Bureau questionnaires by residents of the various counties, and are not based on train schedules or actual driving times from various locations in these counties. These statistics, moreover, do not provide accurate estimates of travel times to Foley Square, because the statistics do not distinguish between midtown Manhattan, where the commuter trains terminate, and lower Manhattan/Foley Square, which requires an additional subway ride. Driving times to Foley Square from these counties also would be predictably greater than the Manhattan average. The Census Bureau survey also does not reflect commuting time specifically to White Plains, but to Westchester County as a whole.

Defendants' statistics do not reflect the limited train service from Orange, Sullivan and Dutchess counties into Manhattan. Also, the morning train service north from Manhattan and the Bronx to White Plains and the evening train service from White Plains to Manhattan and the Bronx is more limited than the rush hour service from Westchester, Rockland and Putnam counties to Manhattan. Furthermore, defendants' statistics do not reflect the difficulty residents of the Bronx and Manhattan would have in traveling to White Plains to serve, should they not own a car or they happen to live in the many areas of those two counties not convenient to the commuter rail line.

Defendants' chart detailing the distances from the geographical center of each county to the two courthouses shows a marked disparity in distance to each of the courthouses from the various county centers. *See* Beveridge Aff. ¶ 36. Clearly, the convenience of the citizens called to jury service is properly addressed by the current jury selection configuration.

portionately represented.[5] This configuration does not violate defendants' Sixth Amendment rights. So long as a division is not "gerrymandered," it will withstand constitutional scrutiny, even if the division differs from the district as a whole in terms of its racial or socio-economic composition. *United States v. Cannady*, 54 F.3d 544, 547 (9th Cir.1995) (citing *United States v. Test*, 550 F.2d 577, 594 (10th Cir.1976)); *United States v. Gottfried*, 165 F.2d at 364. Because the White Plains division is merely drawn along county lines rationally related to the location of the two courthouses and is not gerrymandered, this overlap does not impinge on defendants' Sixth Amendment rights. *See Id.; United States v. Kenny*, 883 F.Supp. at 875.

The Second Circuit has upheld the creation of divisions in its districts solely for the purposes of selecting juries, even if these divisions in a particular district overlap, as they do here. *United States v. Bahna*, 68 F.3d at 24. In *Bahna*, the Second Circuit upheld the jury selection plan then in place for the Eastern District of New York, which has two courthouses on Long Island and one in Brooklyn. *Id.* at 23. The Eastern District at that time selected jurors for its Brooklyn courthouse from the entire district, and selected jurors for its two Long Island courthouses solely from Nassau and Suffolk counties.[6] *Id.* This configuration resulted in Nassau and Suffolk counties being overrepresented in the District as a whole, but all counties were proportionally represented within each respective division. *Id.; United States v. Kenny*, 883 F.Supp. at 874 (finding overlap to be irrelevant so long as proportions within each division were proper); *United States v. Garces*, 849 F.Supp. 852, 860 (E.D.N.Y.1994) (same).

█ Defendants do not examine the racial and ethnic statistics relevant to the White Plains Master Wheel, as they do not even argue that the White Plains Master Wheel does not adequately reflect the relevant population of the northern six counties. Nevertheless, this Court has examined the statistics for the White Plains Qualified Wheel[7] and finds that the percentages of blacks and Hispanics in the White Plains Qualified Wheel are sufficiently similar to the percentages of blacks and Hispanics in the relevant population of the northern six counties. The percentage of blacks in the White Plains Qualified Wheel is 6.5% and the percentage of blacks among voting-age citizens for the northern six counties is 9.2%.[8] Beveridge Aff.

---

5. The number of potential jurors in the White Plains Master Wheel from each county is as follows: Westchester—161,708; Rockland—51,573; Putnam—17,530; Dutchess—48,003; Orange—52,386; Sullivan—15,258.

 The number of potential jurors in the Foley Square Master Wheel from each county is as follows: New York (Manhattan)—292,819; Bronx—190,170; Westchester—161,708; Rockland—51,573; Putnam—17,530.

 Therefore, the total number of potential jurors from each county in the Southern District as a whole is as follows: New York (Manhattan)—292,819; Bronx—190,170; Westchester—323,416; Rockland—103,146; Putnam—35,060; Dutchess—48,003; Orange—52,386; Sullivan—15,258.

 These totals result in each county being represented in the District's master wheels as a whole in the following percentages, after which are listed the percentage of registered voters for each county: New York (Manhattan)—27.6% of total jury pool / 35.3% of registered voters; Bronx—17.9% / 22.9%; Westchester—30.5% / 19.5%; Rockland—9.7% / 6.2%; Putnam—3.3% / 2.1%; Dutchess—4.5% / 5.8%; Orange—4.9% / 6.3%; Sullivan—1.4% / 1.8%.

6. This plan was amended on May 23, 1995, before the Second Circuit upheld the original version of the plan in *Bahna*. *See In re Jury Plan of the Eastern District of New York*, 61 F.3d 119, 120 (2d Cir.1995).

7. The Jury Administrator does not maintain statistics for the racial and ethnic composition of the master wheels. The qualified wheels roughly represent the composition of the corresponding master wheels. To fill the qualified wheels, the Jury Administrator periodically selects a number of names off the corresponding master wheels at random, and sends them juror qualification forms. Of those that are returned, the Jury Administrator examines the forms to determine if the potential jurors are qualified for service. Those who are found to be qualified are placed on the qualified wheel. Statistics of the racial and ethnic composition of the qualified wheels are generated by tabulating potential jurors' responses to questions on their juror qualification forms.

8. The percentage categorized as "Other" race in the White Plains Qualified Wheel is 2.5% and is 1.3% of the voting-age citizens in the division. Beveridge Aff. Exh. G, White Plains Form JS–12,

Exh. G, White Plains Form JS–12, dated Sept. 29, 1997. The percentage of Hispanic voting-age citizens in the division is 4 .9%, and the percentage of Hispanics in the White Plains Qualified Wheel is 3.7%.[9] *Id.* Thus, the absolute disparity between the relevant population and the White Plains Qualified Wheel is 2.7% for blacks and 1.2% for Hispanics. Courts routinely have found similar or greater disparities to be constitutional. *See, e.g., United States v. Rioux,* 97 F.3d 648, 657 (2d Cir.1996) (finding absolute disparities of 1.58% and 2.14% to be "statistically insignificant"); *United States v. Biaggi,* 909 F.2d at 77–78 (finding absolute disparities of 3.6% and 4.7% to be acceptable); *Ramseur v. Beyer,* 983 F.2d 1215, 1232 (3rd Cir.) (holding that absolute disparity of 14.1% was acceptable), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *United States v. McAnderson,* 914 F.2d, 934, 941 (7th Cir. 1990) (holding that 8% absolute disparity was "de minimis"); *United States v. Pepe,* 747 F.2d 632, 649 (11th Cir.1984) (finding 7.6% absolute disparity to be acceptable). A variety of legitimate factors can alter the proportions of various groups placed on the qualified wheel after being drawn at random from the master wheel. *See United States v. Reyes,* 934 F.Supp. 553 *passim* (S.D.N.Y. 1996). Therefore, the Court finds that these absolute disparities are acceptable.

The venires from which grand juries are selected at the White Plains courthouse vary in size, but generally consist of around 100 people. Given the absolute disparities listed above, between two and three blacks and between one and two Hispanics would need to be added to each grand jury venire to achieve an exact representation of the relevant population. Criminal petit jury venires require a minimum of 38 potential jurors. Thus, the absolute disparities indicate that one black would need to be added to each petit jury venire, and one Hispanic added to every other petit jury venire to achieve an exact representation of the relevant population. This analysis reinforces that the disparities are well within constitutional limits.

*See United States v. Biaggi,* 909 F.2d at 678 (holding that addition of two blacks and two Hispanics to achieve perfect parity did not violate Sixth Amendment's fair .cross-section requirement). Therefore, this Court concludes that the disparities in the White Plains Qualified Wheel discussed above fall well within the constitutional limits. As such, defendants have failed to satisfy the second prong of the *Duren* test.

Although this Court need not reach the third prong of the test, it should be noted that nowhere do defendants alleged any systematic exclusion of any particular group in the White Plains jury selection process. They assert that the creation of the divisions themselves systematically excludes blacks and Hispanics, but as already stated, this argument has no merit.

Therefore, defendants have failed to make a prima facie showing that the selection of grand and petit juries at the White Plains courthouse is in violation of the Sixth Amendment.

*b. Equal Protection*

 Three elements are required to prove a prima facie case of discrimination in jury selection in violation of the Equal Protection Clause: (1) the group alleged to be discriminated against must be a recognizable, distinct class; (2) the degree of underrepresentation must be proved over a significant time period; and (3) the selection procedure must be susceptible to abuse or racially non-neutral. *Castaneda v. Partida,* 430 U.S. at 482, 97 S.Ct. at 1280. As stated *supra,* it is not disputed that blacks and Hispanics are recognizable and distinct classes, thus the first prong of this test is satisfied.

As they do with their Sixth Amendment claim, defendants' compare the black and Hispanic populations of the entire district to the black and Hispanic composition of the White Plains Qualified Wheel. As stated *supra,* this Court finds that the absolute disparities between the White Plains Quali-

---

dated Sept. 29, 1997. The percentage of potential jurors in the White Plains Qualified Wheel who are of "Unknown" race is 2.2%. *Id.*

9. The percentage of the White Plains Qualified Wheel who are of "Unknown" ethnicity is 14.5%. Beveridge Aff. Exh. G.

fied Wheel and the relevant population in the northern six counties to be the appropriate comparisons and that these are well within constitutional limits.

In an Equal Protection challenge, however, defendants may submit alternative statistical analyses as evidence of improper underrepresentation. Some courts have looked to the comparative disparity between a jury venire and community population, and have used standard deviation calculations to determine if the disparities could be the result of chance. Defendants here assert that the degree of black and Hispanic underrepresentation is so great that it is clear that such a disparity between the percentage of blacks and Hispanics available for jury service and the percentage of blacks and Hispanics actually on the White Plains wheel could not be the result of chance. Defendants' Memorandum of Law. p. 27; Beveridge Aff., ¶¶ 125–29. The theory is that if the defendants show that a given disparity cannot be the result of chance, then they have made out their prima facie case of an equal protection violation, and the government must supply a plausible justification for the method of selecting jurors. *Castaneda v. Partida*, 430 U.S. at 496, n. 17, 97 S.Ct. at 1281, n. 17; *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir.1986).

This issue has not been properly presented to this Court, however, because defendants compare the wrong numbers. Defendants compare the difference between the percentage of blacks and Hispanics in the entire District and the percentage of blacks and Hispanics in the White Plains Qualified Wheel. As stated *supra*, the community or division of the White Plains courthouse has been properly designated as consisting of the northern six counties of the Southern District. No such statistical comparison using the northern six counties of the Southern District has been presented to this Court, so this argument will not be considered. In any event, absent a showing that the reason for a disparity is not benign and a showing that significant data is missing, the Second Circuit has stated its preference for an absolute disparity analysis. *United States v. Rioux*, 97 F.3d at 656.

Thus, defendants' Equal Protection claim fails because they have not satisfied the second prong of this test. They also have failed to show that the Southern District's jury selection method is "susceptible to abuse or is not racially neutral." *See Castaneda v. Partida*, 430 U.S. at 494, 97 S.Ct. at 1280.

### c. Jury Selection and Service Act

■ The Jury Selection and Service Act of 1968 (hereinafter "Jury Act") mandates that district courts use voter registration lists (or lists of actual voters) as the source of potential jurors. 28 U.S.C. § 1863(b)(2) (1994); *United States v. Reyes*, 934 F.Supp. at 558. The Jury Act forbids the exclusion of jurors based on their race or national origin (among other characteristics). 28 U.S.C. § 1862 (1994). The Act requires:

> that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States.

28 U.S.C. § 1861.

Defendants contend that, however, that the "double dipping" that takes place in the current Jury Plan, referring to the use of the middle three counties in both master wheels, is unconstitutional and violates the Jury Act and therefore invalidates the Southern District's current configuration for jury selection purposes. This Court finds otherwise. The Jury Act defines "division" as: "in a judicial district where there are no statutory divisions, ['division' shall mean] such counties ... surrounding the places where court is held as the district court plan shall determine: Provided, that each county ... shall be included in some such division." 28 U.S.C. § 1869(e) (1994). The Jury Act also requires that the procedures for selecting jurors, "shall ensure that each county ... within the ... division is substantially proportionally represented in the master wheel for that judicial district, division or combination of divisions." 28 U.S.C. § 1863(b)(3).

This Court finds that the Act requires that individuals in each of the counties in a district have an opportunity to serve as jurors, and that, within each jury wheel, there is a proportional representation of the counties included in that wheel. *See United States v. Kenny,* 883 F.Supp. at 874 (holding that similar overlap in Eastern District where Nassau and Suffolk Counties were represented in both Brooklyn and Long Island jury wheels did not violate Jury Act). Because each county is proportionally represented within each division, and citizens of all eight counties are afforded the opportunity to serve on a jury, the Southern District's Jury Plan complies with the Jury Act.

\* \* \* \* \* \*

■ Accordingly, because the method of selecting jurors in the Southern District of New York complies with the Sixth Amendment, the Equal Protection Clause, and the Jury Act, defendants' motions to dismiss the indictment and stay the proceedings are denied.

### 2. *Bill of Particulars*

■ Defendants Johnson, McCall, Carnes and Hunter have made motions asking this Court to compel the government to provide a bill of particulars. Defendants Johnson and McCall, joined by defendant Carnes, request the following information: the locations of the various alleged extortions, the identity of those involved in the extortions, the money and property which defendants sought to obtain, the identities of all of the victims, the nature of the threatened and actual violence, the identities of those who received threats, and the nature of any payments made. Defendant Hunter requests the date, time and place of each overt act attributed to him in the indictment and that the government intends to prove at trial, including those overt acts that show his conspiring to commit extortion; the identities of the alleged extortion victims; and any threats or act of violence allegedly committed by him. Defendants claim they need this information to prepare a defense that their activities fall into the "labor exception" to the Hobbs Act. *See* 18 U.S.C. § 1951(b)(2) (1984).

■ Motions for bills of particulars are directed to the discretion of the Court. *United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir.1984). The purpose of a bill of particulars is to apprise the defendant of the essential facts of a crime and should be required only where the "charges of an indictment are so general that they do not advise a defendant of the specific acts of which he is accused." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.), *cert. denied,* 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990) (quoting *United States v. Feola,* 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989)).

■ A bill of particulars is not an investigative tool for the defendants. *United States v. Gottlieb,* 493 F.2d 987, 994 (2d Cir.1974). It is improper to use a bill of particulars to compel the government to disclose how it will attempt to prove the charges or the precise manner in which a defendant committed the crime charged, or to provide a preview of its evidence and legal theories. *Id.; United States v. Polanco,* No. 97 Cr. 106, 1997 WL 452389 (S.D.N.Y. Aug.8, 1997)(citing *United States v. Jimenez,* 824 F.Supp. 351, 363 (S.D.N.Y.1993)). Because a bill of particulars restricts the government's proof to the particulars furnished, *United States v. Glaze,* 313 F.3d 757, 759 (2d Cir. 1963), a request for a bill of particulars should not be granted where the consequence of granting the request would be to unduly restrict the government's ability to present its case. *United States v. Perez,* 940 F.Supp. 540, 550 (S.D.N.Y.1996).

Moreover, the "manner or means by which a crime is carried out constitute evidentiary matter not ultimate facts...." *United States v. Boneparth,* 52 F.R.D. 544, 545 (S.D.N.Y. 1971). As another judge in this district has stated:

> [The defendants] are not entitled to know ... the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the government intends to adduce to prove their criminal acts, [beyond what is charged in the indictment]. Details as to how and when the conspiracy was formed, or when

each participant entered it, need not be revealed before trial.

*United States v. Persico,* 621 F.Supp. 842, 868 (S.D.N.Y.1985).

The indictment, complaints, and substantial discovery thus far provided by the government provide the defendants with a fair amount of detail regarding the government's charges against them. This Court finds, however, that to ensure that defendants are not unfairly surprised at trial, are able to prepare their defenses, and would be able to preclude a second prosecution for the same offense, they are entitled to more information. *See United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987) (citing *Wong Tai v. United States,* 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927)) (additional citations omitted). Specifically, this Court finds that the defendants are entitled to know the names of the individual corporations that were the alleged victims of the extortions, and the construction sites or projects related to the alleged extortions. The government is ordered to provide a bill of particulars regarding these two issues. All other requests for particulars are denied.

*3. Severance*

■ Defendants McCall and Hunter each seek to be severed from the rest of the defendants in this case pursuant to Rule 14 of the Federal Rules of Criminal Procedure. Defendants Johnson has made a motion seeking to be severed specifically from defendant Mulder, which defendant Carnes joins.

■ A motion to sever is "committed to the sound discretion of the trial court." *United States v. Scarpa,* 913 F.2d 993, 1014 (2d Cir.1990) (quoting *United States v. Casamento,* 887 F.2d 1141, 1149 (2d Cir.1989)). In the federal system, there is a preference that defendants who are indicted together be tried jointly. *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993); *United States v. Rosa,* 11 F.3d 315, 341 (2d Cir.1993), *cert. denied,* 511 U.S. 1096, 114 S.Ct. 1864, 128 L.Ed.2d 485 (1994). A defendant urging severance must shoulder an "extremely difficult burden" of showing that he or she would be so prejudiced by the joinder that he would be denied a constitu-

tionally fair trial. *United States v. Casamento,* 887 F.2d at 1149 (quoting *United States v. Carpentier,* 689 F.2d 21, 27 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983)). *See also United States v. Rosa,* 11 F.3d at 341; *United States v. Torres,* 901 F.2d at 230.

■ It is not sufficient for a defendant to show he or she may suffer some prejudice, or may have a better chance for acquittal at a separate trial. *See United States v. Scarpa,* 913 F.2d at 1015; *United States v. Torres,* 901 F.2d at 213. To be entitled to a separate trial, a defendant is required to show that he or she may suffer prejudice so substantial that a "miscarriage of justice" will occur. *United States v. Friedman,* 854 F.2d 535, 563 (2d Cir.1988), *cert. denied,* 490 U.S. 1004, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989). "The district court should grant a severance motion only if there is a serious risk that a joint trial would compromise a specific trial right of the moving defendant or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Rosa,* 11 F.3d at 341 (citing *Zafiro v. United States,* 506 U.S. at 539, 113 S.Ct. at 938).

■ Defendants here have failed to show that they would suffer prejudice so substantial that a "miscarriage of justice" would occur in absence of severance. Defendants are charged with conspiracy, and generally, in conspiracy cases, the government is entitled to present the entire range of evidence against each defendant. *See United States v. Nersesian,* 824 F.2d 1294, 1304 (2d Cir.) *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). Simply because a defendant may consider the evidence against him or her weaker than the evidence against the other co-defendants is not a reason to sever. *Id.* As such, defendants have not shown the evidence admissible against other co-defendants in the conspiracy would not be admissible at separate trials. *See Id.; United States v. Girard,* 601 F.2d 69, 71 (2d Cir.) ("Where, as here, the crime charged involves a common scheme or plan, a joint trial of the participants is proper, absent a clear showing of prejudice."), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979). In particu-

lar, defendants have not made a sufficient showing that the homicide allegedly committed by defendant Mulder would not be admissible against all defendants in the conspiracy at separate trials.

Furthermore, the government has estimated that the trial in this case will take four to six weeks, and involve extensive playing of wiretap tapes. Given the estimated length of trial, the Court has a substantial interest and conserving judicial resources. Absent a compelling need to do so, it would be a waste of judicial resources to try this case more than once.

Accordingly, defendants' motions for severance are denied.

### 4. Motion to Preclude

▮ Defendant Hunter has filed a motion asking the Court to preclude certain tape recorded conversations at trial. Hunter asserts that the government has erroneously attributed some of the conversations on these tapes to him. He also requests a hearing to determine the accuracy of the government's attributions. Hunter does not, however, identify with any particularity the tapes he seeks to preclude. Therefore, this Court is not in a position to make an informed ruling on this application. Accordingly, defendant Hunter's motion to preclude is denied, with leave to renew with more specificity, detailing which particular tapes he seeks to preclude and the basis for their preclusion.

### Conclusion

Defendants' motions to dismiss the indictment and stay the proceedings are denied. Defendants' motions for a bill of particulars are granted in part and denied in part. Defendants' motions for severance are denied. Defendant Hunter's motion to preclude is denied with leave to renew.

SO ORDERED: